JAY BURNS BAKING COMPANY ET AL. *v.* BRYAN, AS GOVERNOR OF THE STATE OF NEBRASKA, ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF NEBRASKA.

No. 94. Argued October 19, 1923.—Decided April 14, 1924.

1. The power of a State to protect the public from imposition by sale of short-weight loaves of bread cannot be exerted in such a way as arbitrarily to prohibit or interfere with, or impose unrea-

sonable and unnecessary restrictions upon, the business of making
and selling it.  P. 513.
2. It is the duty of the court to determine whether a regulation
   challenged under the Constitution has a reasonable relation to, and
   a real tendency to accomplish, the purpose for which it was
   enacted.  *Id.*
3. A statute of Nebraska prescribes the minimum weights of loaves
   of bread to be made, or offered, for sale in the State, and, in order
   to prevent the palming off of smaller for larger sizes, fixes a
   maximum for each class, by allowing a "tolerance" of only two
   ounces per pound in excess of the minimum, the weights to be
   determined by averaging loaves of each class in lots of twenty-five,
   and to apply for twenty-four hours after baking.  The evidence
   demonstrated that owing to normal evaporation from bread under
   conditions of temperature and humidity often prevailing in
   Nebraska, it is impossible to manufacture good bread in the regular
   way without frequently exceeding the prescribed tolerance and
   incurring the burden of penalties prescribed by the statute, and
   that compliance would necessitate selection of ingredients making
   an inferior and unsalable bread, or wrapping the loaves, although
   wrapping is not required by the statute and unwrapped loaves are
   wholesome food in much demand by consumers.  *Held,* That, in
   the circumstances, the provision that average weights shall not
   exceed these maxima is not necessary to protect purchasers against
   imposition and fraud by short weights, and not calculated to
   effectuate that purpose; and that it subjects bakers and sellers
   of bread to restrictions essentially unreasonable and arbitrary;
   and is therefore repugnant to the Fourteenth Amendment.  P. 514.
108 Neb. 674, reversed.

ERROR to a judgment of the Supreme Court of Ne-
braska affirming a decree dismissing a suit brought by
bakers and sellers of bread against state officials to restrain
enforcement of a statute regulating the weights of loaves.

*Mr. Matthew A. Hall,* with whom *Mr. Raymond G.
Young* and *Mr. Carroll S. Montgomery* were on the briefs,
for plaintiffs in error.

Laws fixing specific weights for loaves of bread are
construed to be only against short weights, and do not
prohibit greater weights than the standards provided.

*People* v. *Wagner,* 86 Mich. 594; *State* v. *Huber,* 4 Boyce, 259; *Allion* v. *Toledo,* 99 Oh. St. 416; *Chicago* v. *Schmidinger,* 243 Ill. 167; *Schmidinger* v. *Chicago,* 226 U. S. 578; *Chicago* v. *Schweifurth,* 174 Ill. App. 64.

The same is true in regard to other articles. *Spokane* v. *Arnold,* 73 Wash. 256; *State* v. *Co-Operative Store Co.,* 123 Tenn. 399.

A law fixing a maximum as well as a minimum weight for a loaf is illegal and invalid. *Harwood* v. *Williamson,* 1 Sask. L. Rep. 66.

Dangerous articles are subject to regulation by law, where harmless articles are exempt. *Williams* v. *Walsh,* 79 Kan. 212; s. c. 222 U. S. 415.

There must be some logical connection between the object sought to be accomplished by the law and the means prescribed. *Chicago* v. *Chicago, etc. Ry. Co.,* 275 Ill. 30; *Chicago, etc. Ry. Co.* v. *State,* 47 Neb. 549.

The right to contract is property. Taylor, Due Process of Law, § 265, pp. 490, 491; *State* v. *Goodwill,* 33 W. Va. 179; *Braceville* v. *People,* 147 Ill. 66.

Laws enacted under the guise of police regulation must have some relation to the public health, welfare or safety. *Smiley* v. *McDonald,* 42 Neb. 5; *Wenham* v. *State,* 65 Neb. 394; *Union Pacific Ry. Co.* v. *State,* 88 Neb. 247; *State* v. *Withnell,* 91 Neb. 101; *Urbach* v. *Omaha,* 101 Neb. 314; *Mugler* v. *Kansas,* 123 U. S. 623.

The regulation must not be an arbitrary and unreasonable interference with the rights of individuals. *In re Anderson,* 69 Neb. 686; *Lawton* v. *Steele,* 152 U. S. 133; *Connecticut Co.* v. *Stamford,* 95 Conn. 26.

Police power means the power of the State to prohibit all things hurtful to the comfort, safety or welfare of the community. *License Cases,* 5 How. 504.

The police power does not justify an enactment merely because there is a possibility of danger which it is sought to avert. *Ex parte Whitewell,* 98 Cal. 73; Freund, Police

Power, § 494; *State* v. *Sperry,* 94 Neb. 785; *Young* v. *Commonwealth,* 101 Va. 853; *State* v. *Ramseyer,* 73 N. H. 31.

If an invalid portion of an act formed an inducement to the passage of the act, the whole act will be declared invalid. *Trumble* v. *Trumble,* 37 Neb. 340; *State* v. *Poynter,* 59 Neb. 417; *State* v. *Junkin,* 85 Neb. 1.

The Constitution is violated when persons engaged in the same business are subjected to different restrictions. *Soon Hing* v. *Crowley,* 113 U. S. 703; *Louisville & Nashville R. R. Co.* v. *Bosworth,* 230 Fed. 191; *Standard Oil Co.* v. *Red River Parish Police Jury,* 140 La. 42; *Black* v. *State,* 113 Wis. 205; *In re Von Horne,* 74 N. J. Eq. 600.

A law palpably unreasonable and arbitrary and exceeding all reasonable classification, is not within the police power of a State. *Price* v. *Illinois,* 238 U. S. 446; *Meyer* v. *Nebraska,* 262 U. S. 390; *Mugler* v. *Kansas,* 123 U. S. 623.

Determination by the legislature of what constitutes proper exercise of police power is subject to supervision by the courts. *Meyer* v. *Nebraska, supra; Mugler* v. *Kansas, supra.*

The business of baking is not clothed with a public interest. *Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522.

Freedom of contract is the general rule, and restraint is the exception; and restraint can only be justified by exceptional circumstances. *Adkins* v. *Children's Hospital,* 261 U. S. 525; *State* v. *Edgecomb,* 108 Neb. 859.

Only public necessity can justify the exercise of the police power by a State. *Chicago, etc. Ry. Co.* v. *Drainage Commissioners,* 200 U. S. 561; *State* v. *Edgecomb, supra; People* v. *Klinck,* 214 N. Y. 121.

The constitutionality of a law may depend upon the result of its practical operation. *Erickson* v. *Nine Mile Irrig. Dist.,* 192 N. W. 694.

*Mr. Lloyd Dort,* Assistant Attorney General of the State of Nebraska, with whom *Mr. O. S. Spillman,* Attorney General, was on the brief, for defendants in error.

Equity will not interfere with the enforcement of criminal statutes.

The mere possibility that property rights of an individual may be affected is not sufficient.

In the present case no criminal prosecution had been instituted and even before the law was in operation it was attacked. The bakers have never made any *bona fide* effort to comply with the law.

The law in question does not violate the Constitution of the United States nor that of Nebraska.

The law is a regulatory law and it does not in any manner confiscate the property or business of the bakers nor prohibit them from continuing their occupation.

It is claimed that the law makes no provision for the punishment of nonresidents of the State. It is not required, however, that the law be uniform except as operating within the jurisdiction of the State.

It has been definitely decided that the regulation of the manufacture and sale of food articles, bread in particular, is a proper subject of legislation. *Schmidinger* v. *Chicago,* 226 U. S. 578; *Chicago* v. *Schmidinger,* 243 Ill. 167; *People* v. *Wagner,* 86 Mich. 594; *State* v. *Normand,* 76 N. H. 541; *State* v. *Layton,* 160 Mo. 474.

The bread law is not invalid under § 14, Art. III, of the Constitution of Nebraska, which provides that no bill shall contain more than one subject and that the same shall be clearly expressed in the title. *Merrill* v. *State,* 65 Neb. 1.

The law does not deprive the bakers of their vested property rights without compensation. *Enos* v. *Hanff,* 95 Neb. 184; *Chicago, etc. Ry. Co.* v. *State,* 47 Neb. 549.

The law cannot be held unreasonable because it limits the size of the loaves to specified weights or because it

does not permit loaves of other weights to be made for sale by special contract. *Schmidinger* v. *Chicago,* 226 U. S. 578.

The mere fact that there may be expense in connection with change of appliances and equipment of the bakeries does not constitute a taking of vested property rights without compensation, in violation of law. The right to operate any business is always dependent upon the general welfare of the people and the operation of the police power. The legislature has determined that the law is necessary on account of the frauds being perpetrated upon the purchasing public and in order that the public may be advised of the merchandise which they receive for the purchase price.

This being true, it appears that any of the property of the bakers which can be used only for the baking of bread which is in fraud of the public would have been used in the perpetration of a fraud upon the public in the production of short weight loaves.

It is contended by the bakers that they fluctuated the sizes of the loaves to meet the cost of the ingredients. The legislature, however, has said with good reasoning that it is just as easy for the bakers to give a standard weight loaf and to fluctuate the price instead of the weight of the loaves.

Considering the minimum weight provision in the law, it has been decided that laws prescribing standard size loaves of bread and prohibiting with minor exceptions the sale of other sizes, should be sustained. *Schmidinger* v. *Chicago, supra; Mobile* v. *Yuille,* 3 Ala. 137; *Chicago* v. *Schmidinger,* 243 Ill. 167; *People* v. *Wagner, supra; Commonwealth* v. *McArthur,* 152 Mass. 522.

The law is uniform in operation within the State.

Necessity for the law is exclusively a legislative question. *State* v. *Morehead,* 99 Neb. 527; *Schultz* v. *State,* 89 Neb. 34; *State* v. *Collum,* 138 La. 395; *Halter* v. *State,* 74 Neb. 757; 205 U. S. 34.

Plaintiffs in error have introduced much evidence concerning the scientific baking of bread. If, after frequent attempts to bake bread which complies with the provisions of the law, they had failed, such evidence would have some bearing. They failed to make one attempt to comply with the law. The evidence shows that bread may easily be baked within the two ounce tolerance.

MR. JUSTICE BUTLER delivered the opinion of the Court.

An act of the legislature of Nebraska, approved March 31, 1921 (Laws 1921, c. 2, p. 56)[1] provides that every loaf of bread made for the purpose of sale, or offered for sale, or sold, shall be one-half pound, one pound, a pound and a half, or exact multiples of one pound, and prohibits loaves of other weights. It allows a tolerance in excess of the specified standard weights at the rate of two ounces per pound

---

[1] An Act establishing a standard weight loaf of bread for the State of Nebraska and providing a penalty. . . .

Section 1. Department of agriculture to enforce.—It shall be the duty of the Department of Agriculture to enforce all provisions of this Act. It shall make or cause to be made all necessary examinations and shall have authority to promulgate such rules and regulations as are necessary to promptly and effectively enforce the provisions of this Act.

Sec. 2. Bread, standards of weight.—Every loaf of bread made or procured for the purpose of sale, sold, exposed or offered for sale in the State of Nebraska shall be the following weights avoirdupois, one-half pound, one pound, one and one-half pounds, and also in exact multiples of one pound and of no other weights. Every loaf of bread shall be made of pure flour and wholesome ingredients and shall be free from any injurious or deleterious substance. Whenever twin or multiple loaves are baked, the weights herein specified shall apply to each unit of the twin or multiple loaf.

Sec. 3. Tolerance, how determined.—A tolerance at the rate of two ounces per pound in excess of the standard weights herein fixed shall be allowed and no more, provided that the standard weights herein prescribed shall be determined by averaging the weight of not less than twenty-five loaves of any one unit and such average shall not

and no more, and requires that the specified weight shall be
the average weight of not less than 25 loaves, and that
such average shall not be more than the maximum nor less
than the minimum prescribed.    Violations of the act are
punishable by a fine or imprisonment.

Four of the plaintiffs in error are engaged in Nebraska
in the business of baking and selling bread for consump-
tion there and in other States.   Their total annual output
is alleged to be 23,500,000 pounds.   The other plaintiff in
error is a retail grocer at Omaha, and sells bread to con-
sumers principally in single loaf lots.   They brought this
suit against the Governor and the Secretary of the De-
partment of Agriculture of the State to restrain the en-
forcement of the act on the ground, among others, that it
is repugnant to the due process clause of the Fourteenth
Amendment.   The State Supreme Court sustained the act.
The case is here on writ of error.

Plaintiffs in error do not question the power of the
State to enact and enforce laws calculated to prevent the
sale of loaves of bread of less than the purported weight;
but they contend that the provision fixing the maximum
weights in this statute is unnecessary, unreasonable and
arbitrary.

---

be less than the minimum nor more than the maximum prescribed by
this Act.   All weights shall be determined on the premises where
bread is manufactured or baked and shall apply for a period of at
least twenty-four hours after baking.   Provided, that bread shipped
into this state shall be weighed where sold or exposed for sale.

Sec. 4. Penalties for violation.—Any person, firm or corporation
violating any of the provisions of this Act, shall be punished by a fine
of not less than ten dollars nor more than one hundred dollars or by
imprisonment in the county jail for not more than thirty days.   Pro-
vided, however, that upon the second and all subsequent convictions
for the violation of any of the provisions of this Act such offender
shall be punished by a fine of not less than fifty dollars nor more
than one hundred dollars, or by imprisonment in the county jail for
not more than ninety days.

The brief of the Attorney General states that the law is concerned with weights only. The State Supreme Court said (108 Nebr. 674, 678): " It is to prevent a loaf of one standard from being increased in size until it can be readily sold for a loaf of a larger standard that a maximum weight is fixed. The test is reasonableness. . . . (p. 679.) The statutory margin or tolerance being two ounces to the pound, can bakers, for example, make a loaf 18 ounces in weight that will weigh not less than 16 ounces 24 hours after it is baked? The tests and proofs on behalf of the State tend to show that the regulation is reasonable and can be observed at all times. [In most of these tests, wrapped loaves were used.] It is fairly inferable from the evidence adduced by plaintiffs that compliance with the regulation is practicable most of the time, but that tested by their experiments as made, there are periods when the operation of natural laws will prevent compliance with legislative requirements. There are a number of reasons, however, why the tests made to prove unreasonableness should not be accepted as conclusive. If correctly understood, these tests were made with bread manufactured in the regular course of business, without any attempt to change ingredients or processes or to retard evaporation of moisture in loaves by the use of wax-paper or other means. . . . (p. 680.) The act of the legislature does not fix prices but leaves bakers free to make reasonable charges for bread wrapped in inexpensive wax-paper for its preservation in transportation and in the markets. . . . Precautions to retard evaporation of moisture in bread for the purpose of keeping it in a good state of preservation for 24 hours may be required as an incidental result of a police regulation establishing standards of maximum weights for loaves of bread. Palatableness, a quality demanded by the public, is affected by excessive evaporation, if food value is not. . . . The evidence does not prove that, if reasonable means or precautions are taken by plaintiffs

and other bakers to retard evaporation, they cannot comply with the act of the legislature, or that the regulation is unreasonable."

Undoubtedly, the police power of the State may be exerted to protect purchasers from imposition by sale of short weight loaves. *Schmidinger* v. *Chicago,* 226 U. S. 578, 588. Many laws have been passed for that purpose. But a State may not, under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them. *Lawton* v. *Steele,* 152 U. S. 133, 137; *Meyer* v. *Nebraska,* 262 U. S. 390, 399. Constitutional protection having been invoked, it is the duty of the court to determine whether the challenged provision has reasonable relation to the protection of purchasers of bread against fraud by short weights and really tends to accomplish the purpose for which it was enacted. *Meyer* v. *Nebraska, supra; Welch* v. *Swasey,* 214 U. S. 91, 105; *Dobbins* v. *Los Angeles,* 195 U. S. 223, 236; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 556; *Lawton* v. *Steele, supra.*

The loaf is the usual form in which bread is sold. The act does not make it unlawful to sell individual loaves weighing more or less than the standard weights respectively. Loaves of any weight may be sold without violation of the act, if the average weight of not less than 25 does not exceed the permitted maximum or fall short of the specified nominal weights during 24 hours after baking. Undoubtedly, very few private consumers purchase at one time as many as 25 loaves of the same standard size or unit. And it is admitted that the sale of a lesser number not within the permitted tolerance does not constitute an offense. Plaintiffs in error do not claim that it is impossible to make loaves which for at least 24 hours after baking will weigh not less than the specified minimum weights, but they insist that the difference per-

mitted by the act between the weight of loaves when taken from the oven and their weight 24 hours later is too small, and that it is impossible for bakers to carry on their business without sometimes exceeding the maximum or falling short of the minimum average weights. Any loaves of the same unit at any time on hand during 24 hours after baking may be selected to make up the 25 or more to be weighed in order to test compliance with the act. Therefore, if only a small percentage of the daily output of the loaves in large bakeries shall exceed the maximum when taken from the oven or fall below the minimum weight within 24 hours, it will always be possible to make up lots of 25 or more loaves whose average weight will be above or below the prescribed limits.

The parties introduced much evidence on the question whether it is possible for bakers to comply with the law. A number of things contribute to produce unavoidable variations in the weights of loaves at the time of and after baking. The water content of wheat, of flour, of dough[2] and of bread immediately after baking varies substantially and is beyond the control of bakers. Gluten is an important element in flour, and flour rich in gluten requires the addition of more water in breadmaking and makes better bread than does flour of low or inferior gluten content. Exact weights and measurements used

[2] Wheat bread dough is the dough consisting of a leavened and kneaded mixture of flour, potable water, edible fat or oil, sugar and / or other fermentable carbohydrate substance, salt, and yeast, with or without the addition of milk or a milk product, of diastatic and / or proteolytic ferments, and of such limited amounts of unobjectionable salts as serve solely as yeast nutrients, and with or without the replacement of not more than three per cent of the flour ingredient by some other edible farinaceous substance. (Definition of Joint Committee on Definitions and Standards, September 28, 1922, and approved by the Association of American Dairy Food and Drug Officials, October 5, 1922, and by the Association of Official Agricultural Chemists, November 17, 1922.)

in doughmaking cannot be attained.   Losses in weight while dough is being mixed, during fermentation and while the bread is in the oven, vary and cannot be avoided or completely controlled.   No hard and fast rule or formula is followed in breadmaking.   There are many variable elements.   Bread made from good flour loses more weight by evaporation of moisture after baking than does bread made from inferior flours.   Defendants' tests were made principally with loaves which were wrapped so as to retard evaporation; and it was shown that by such wrapping the prohibited variations in weight may be avoided.   On the other hand, the evidence clearly establishes that there are periods when evaporation under ordinary conditions of temperature and humidity prevailing in Nebraska exceeds the prescribed tolerance and makes it impossible to comply with the law without wrapping the loaves or employing other artificial means to prevent or retard evaporation.   And the evidence indicates that these periods are of such frequency and duration that the enforcement of the penalties prescribed for violations would be an intolerable burden upon bakers of bread for sale.   The tests which were described in the evidence and referred to in the opinion are not discredited because " made with bread manufactured in the regular course of business."   The reasonableness of the regulation complained of fairly may be measured by the variations in weight of bread so made.   The act does not require bakers to select ingredients or to apply processes in the making of bread that will result in a product that will not vary in weight during 24 hours after baking as much as does bread properly made by the use of good wheat flour.   As indicated by the opinion of the State Supreme Court, ingredients selected to lessen evaporation after baking would make an inferior and unsalable bread.   It would be unreasonable to compel the making of such a product or to prevent making of good bread in order to comply

with the provisions of the act fixing maximum weights. The act is not a sanitary measure. It does not relate to the preservation of bread in transportation or in the market; and it applies equally whether the bread is sold at the bakeries or is shipped to distant places for sale. Admittedly, the provision in question is concerned with weights only. The act does not regulate moisture content or require evaporation to be retarded by the wrapping of loaves or otherwise. The uncontradicted evidence shows that there is a strong demand by consumers for unwrapped bread. It is a wholesome article of food, and plaintiffs in error and other bakers have a right to furnish it to their customers. The lessening of weight of bread by evaporation during 24 hours after baking does not reduce its food value. It would be unreasonable to prevent unwrapped bread being furnished to those who want it in order technically to comply with a weight regulation and to keep within limits of tolerance so narrow as to require that ordinary evaporation be retarded by wrapping or other artificial means. It having been shown that during some periods in Nebraska bread made in a proper and usual way will vary in weight more than at the rate of two ounces to the pound during 24 hours after baking, the enforcement of the provision necessarily will have the effect of prohibiting the sale of unwrapped loaves when evaporation exceeds the tolerance.

No question is presented as to the power of the State to make regulations safeguarding or affecting the qualities of bread. Concretely, the sole purpose of fixing the maximum weights, as held by the Supreme Court, is to prevent the sale of a loaf weighing anything over nine ounces for a one pound loaf, and the sale of a loaf weighing anything over eighteen ounces for a pound and a half loaf; and so on. The permitted tolerance, as to the half pound loaf, gives the baker the benefit of only one ounce

out of the spread of eight ounces, and as to the pound loaf the benefit of only two ounces out of a like spread. There is no evidence in support of the thought that purchasers have been or are likely to be induced to take a nine and a half or a ten ounce loaf for a pound (16 ounce) loaf, or an eighteen and a half or a 19 ounce loaf for a pound and a half (24 ounce) loaf; and it is contrary to common experience and unreasonable to assume that there could be any danger of such deception. Imposition through short weights readily could have been dealt with in a direct and effective way. For the reasons stated, we conclude that the provision, that the average weights shall not exceed the maximums fixed, is not necessary for the protection of purchasers against imposition and fraud by short weights and is not calculated to effectuate that purpose, and that it subjects bakers and sellers of bread to restrictions which are essentially unreasonable and arbitrary, and is therefore repugnant to the Fourteenth Amendment.

*Judgment reversed.*

MR. JUSTICE BRANDEIS, (with whom MR. JUSTICE HOLMES concurs) dissenting.

The purpose of the Nebraska standard-weight bread law is to protect buyers from short weights and honest bakers from unfair competition. It provides for a few standard-size loaves, which are designated by weight, and prohibits, as to each size, the baking or selling of a loaf which weighs either less or more than the prescribed weight. *Schmidinger* v. *Chicago*, 226 U. S. 578, settled that the business of making and selling bread is a permissible subject for regulation; that the prevention of short weights is a proper end of regulation; that the fixing of standard sizes and weights of loaves is an appropriate means to that end; and that prevalent marketing frauds make the enactment of some such protective legislation

permissible. The ordinance there upheld, besides defining the standard-weight loaf, required that every loaf should bear a label stating the weight; and to sell a loaf weighing less than the weight stated in the label was made a misdemeanor.

The Nebraska regulation is in four respects less stringent than the ordinance upheld in the *Schmidinger Case:* (1) It provides for a tolerance. That is, it permits a deviation from the standard weight of not more than two ounces in a pound, provided that the prescribed standard weight shall be determined by averaging the weights of not less than twenty-five loaves of any one unit. (2) The prescribed weight applies for only twenty-four hours after the baking. (3) The weight is to be ascertained by weighing on the premises where the bread is baked. (4) No label stating the weight is required to be affixed to the loaf. That is, as a representation of the weight, the familiar size of the loaf is substituted for the label. On the other hand, the Nebraska requirement is more stringent than the Chicago ordinance, in that it prohibits making and selling loaves which exceed the prescribed weight by more than the tolerance. This prohibition of excess weights is held to deny due process of law to bakers and sellers of bread. In plain English, the prohibition is declared to be a measure so arbitrary or whimsical that no body of legislators acting reasonably could have imposed it. In reaching this conclusion, the Court finds specifically that this prohibition "is not necessary for the protection of purchasers against imposition and fraud by short weight"; that it "is not calculated to effectuate that purpose"; and that the practical difficulties of compliance with the limitation are so great that the provision "subjects bakers and sellers of bread to restrictions which are essentially unreasonable and arbitrary."

To bake a loaf of any size other than the standard is made a misdemeanor. Why baking a loaf which weighs

less than the standard size should be made a crime is obvious. Such a loaf is a handy instrument of fraud. Why it should be a crime to bake one which weighs more than the standard is not obvious. The reason given is that such a loaf, also, is a handy instrument of fraud. In order that the buyer may be afforded protection, the difference between the standard sizes must be so large as to be evident and conspicuous. The buyer has usually in mind the difference in appearance between a one-pound loaf and a pound-and-a-half loaf, so that it is difficult for the dealer to palm off the former for the latter. But a loaf weighing one pound and five ounces may look so much like the buyer's memory of the pound-and-a-half loaf that the dealer may effectuate the fraud by delivering the former. The prohibition of excess weight is imposed in order to prevent a loaf of one standard size from being increased so much that it can readily be sold for a loaf of a larger standard size.[1]

With the wisdom of the legislation we have, of course, no concern. But, under the due process clause as construed, we must determine whether the prohibition of excess weights can reasonably be deemed necessary; whether the prohibition can reasonably be deemed an appropriate means of preventing short weights and incidental unfair practices; and whether compliance with the limitation prescribed can reasonably be deemed practicable. The determination of these questions involves an enquiry into

---

[1] See Charles C. Neale, " Weight Standardization of Bread ", 13 Conf., Weights & Measures, pp. 115, 116; C. J. Kremer, " Bread Weight Legislation and Retail Bakers ", 16 Conf., Weights & Measures, pp. —; Hearings on H. R. 4533, Feb. 18, 19, 1924, pp. 11, 12. Compare 4 Conf., Weights & Measures, pp. 18, 19; 5 Conf., Weights & Measures, p. 113; 1914 Wisconsin Dairy, Food and Weights and Measures Dept., Bul. No. 14, p. 18; 1920 New Jersey Weights and Measures Dept., p. 18; 1921 Chicago Weights and Measures Dept., p. 4.

facts. Unless we know the facts on which the legislators may have acted, we cannot properly decide whether they were (or whether their measures are) unreasonable, arbitrary or capricious. Knowledge is essential to understanding; and understanding should precede judging. Sometimes, if we would guide by the light of reason, we must let our minds be bold. But, in this case, we have merely to acquaint ourselves with the art of breadmaking and the usages of the trade; with the devices by which buyers of bread are imposed upon and honest bakers or dealers are subjected by their dishonest fellows to unfair competition; with the problems which have confronted public officials charged with the enforcement of the laws prohibiting short weights, and with their experience in administering those laws.

*First.* Why did legislators, bent only on preventing short weights, prohibit, also, excessive weights? It was not from caprice or love of symmetry. It was because experience had taught consumers, honest dealers and public officials charged with the duty of enforcing laws concerning weights and measures that, if short weights were to be prevented, the prohibition of excessive weights was an administrative necessity. Similar experience had led to the enactment of a like prohibition of excess quantities in laws designed to prevent defrauding, by short measure, purchasers of many other articles.[2] It was similar ex-

---

[2] A similar policy, enacted by statute or regulation, is applied to fish, pork, milk, gasoline, hay, fruits, vegetables and other commodities. See Maryland, Laws of 1817 (Session of December, 1817 to February, 1818), c. 114, § 1; New York, Laws of 1910, c. 470, §§ 5a, 5b, Laws of 1912, c. 81, §§ 240, 252, 1911 Weights and Measures Dept., p. 46; Maine, 1913 Pub. Laws, c. 81, § 1, 1916 Rev. Stat. c. 37, § 20, 1919 Rev. Stat. c. 37, § 20; Arizona, 1913 Laws, § 26; Massachusetts, 1921 Gen. Laws, c. 23, § 85, c. 98, § 15. See specifications and tolerances adopted by the department of weights and measures in Arizona, 1921; California, 1914, 1915, 1919, Report of Dept. Weights & Measures, 1917–1918, p. 65; Indiana, 1913; Massachusetts, 1917,

perience which had led those seeking to prevent the sale of intoxicating liquor to enact the law which prohibits the sale of malt liquor, although not containing any alcohol (sustained in *Purity Extract Co.* v. *Lynch,* 226 U. S. 192), and that which prohibits the sale of liquor containing more than one-half of one per cent. of alcohol (sustained in *Ruppert* v. *Caffey,* 251 U. S. 264). Compare *Armour & Co.* v. *North Dakota,* 240 U. S. 510.

In January, 1858, the late corporation of Washington adopted an ordinance fixing a standard-weight loaf, and establishing an excess tolerance.[3]  The standard-weight bread ordinance adopted by Chicago in 1908 and sustained in the *Schmidinger Case* is said to have been the first standard-weight bread law in the United States enacted in this century.[4]  Prior thereto many different kinds of legislation had been tried in the several States and cities

Report of Sealer of Weights and Measures for Worcester, Mass., 1905, p. 5; New York, 1910, 1913, 1915; North Dakota, 1919; Pennsylvania, 1921; Tennessee, 1914; Vermont, 1920; Washington, 1913; Wisconsin, 1911, 1913; District of Columbia, 1897, 1901. See, also, regulations promulgated by the Secretary of Agriculture pursuant to § 4 of the Standard Container Act, Aug. 31, 1916, c. 426, 39 Stat. 673; specifications and tolerances adopted by the Conference on Weights and Measures, 1915, 1916, 1920. And see Report, Conf. Weights & Measures, 1911, pp. 127, 129; 1913, pp. 278, 284, 289; 1914, p. 57, *et seq.;* 1916, p. 130 *et seq.;* 1919, p. 169, *et seq.;* 1920, p. 110. Compare *Turner* v. *Maryland,* 107 U. S. 38, 50, 51, note, 53 note, 54, 56.

[3] Permitted a tolerance in excess of 2 ounces on the 1 pound loaf; 3 ounces on the 2 pound loaf; and 4 ounces on the 4 pound loaf. The ordinance, promulgated by the mayor and aldermen of the late corporation of Washington, Jan. 7, 1858, was not questioned until Aug. 31, 1908. In *District of Columbia* v. *Hauf,* 33 App. D. C. 197, it was held that the Organic Act of Feb. 21, 1871, 16 Stat. 419, repealed this ordinance by implication. Up to the date of the decision, its operation had been entirely satisfactory. See statement of W. C. Haskell, 5 Conf., Weights & Measures, pp. 19–22.

[4] See Hearings on H. R. 4533, Feb. 18, 19, 1924, p. 18; 5 Conf., Weights & Measures, pp. 26–29.

with a view to preventing short weights.[5] Experience had shown the inefficacy of those preventive measures. Experience under the Chicago ordinance indicated the value of introducing the standard-weight loaf; but it proved, also, that the absence of a provision prohibiting excess weights seriously impaired the efficacy of the ordinance.[6] When in 1917 the United States Food Administration was established, pursuant to the Lever Act (August 10, 1917, c. 53, 40 Stat. 276), the business of baking came under its supervision and control; and provision was made for licensing substantially all bakers.[7] The protection of buyers of bread against the fraud of short weight was deemed essential.[8] After an investigation which occupied three months, the Food Administration issued the regu-

[5] See *Mayor and Aldermen of Mobile v. Yuille*, 3 Ala. 137; *Kansas v. McCool*, 83 Kans. 428; *Guillotte v. New Orleans*, 12 La. Ann. 432; *Commonwealth v. McArthur*, 152 Mass. 522; *People v. Wagner*, 86 Mich. 594; *Paige v. Fazackerly*, 36 Barb. 392. Also brief for plaintiff in error (appendix) in *Schmidinger v. Chicago*, 226 U. S. 578. Compare *Harwood v. Williamson*, 1 Sask. L. Rep. 66.

[6] See Report Chicago Dept. Weights & Measures, 1913, p. 6; 1917, p. 6; 1918, p. 3. See also 1911 New York Dept. Weights & Measures, p. 46; " Weights and Prices of Wheat Bread in Mass.," compiled by director of Standards, Jan. 1, 1924. Compare Report, Conf. on Weights & Measures, 4, pp. 18, 19; 6, p. 47; 8, pp. 18, 19; 9, pp. 20, 22; 14, pp. 30, 35. The new ordinance in Chicago is operating successfully. See 1921 Chicago Dept. Weights & Measures, p. 4; 14 Conf., Weights & Measures, p. 36.

[7] See 1917 Report U. S. Food & Fuel Administrations, pp. 10, 11, 36–38.

[8] The license regulations issued by Herbert Hoover, with the approval of the President, on November 16, 1917 were " worked out to a large degree with the bakers themselves with the co-operation of the Federal Trade Commission and the Agricultural Department." See Letter of Herbert Hoover to the President, Nov. 6, 1917. They were aided by a Consumers' Committee. The Food Administration had, also, the results of an investigation, which had been theretofore conducted by Benj. R. Jacobs of the Bureau of Chemistry, on the marketing of bread in the City of Washington. In his " Preliminary Report,

lations by which licensees were to be governed. No standard-weight bread statute had then been enacted in

B. R. Jacobs to Duncan McDuffie, Aug. 14, 1917," he recommended: " The standardization of the loaf of bread by weight . . . (c) because when weights are declared they are made in such small-size type that it is very difficult for the consumer to see it and also when the weight is declared the bakers seem to enter into an agreement whereby they all mark the same weight on the bread regardless of the size, thus nullifying to a great extent the value of this declaration."

The " Preliminary Report on the Bread Problem, September 29, 1917," of Duncan McDuffie includes the following recommendation (p. 47): " The Food Administration is charged, not only with seeing that the public secures its bread at the lowest possible price, but that in making its purchases of this commodity it receives a square deal. In my opinion, both these objects can best be obtained by permitting bread to be sold only in units of fixed weight. As these units I recommend loaves weighing, twelve hours after being baked, not less than 16 nor more than 17 ounces, and not less than 24 or more than 25½ ounces and multiples of both these weights."

Ordinances in force, at that time, in Chicago, Dallas, Detroit, Jackson, Minneapolis, Seattle, Tacoma and Washington, and the statutes of Kansas, Idaho, Nevada and North Dakota provided for a few standard size loaves; and some of these provided, further, that the loaves must be labeled with the weight, if not in these units. (See Appendix.) Referring to such regulations, the report says (p. 49): " Many of these regulations permit the manufacture of bread of other sizes provided that bread is labeled with its exact weight. Tolerances are also permitted in some instances on account of shrinkage of weight due to evaporation of the moisture contained in the bread. Many of these regulations provide merely that bread shall not be produced in units weighing less than those fixed. The result of this regulation has been that bakers labeled the bread with the unit weight next below its actual weight, thus making standardization ineffective.

" In many instances these regulations have not produced satisfactory results. This may be attributed to lack of universality, evasion on the part of the baker, or failure of the law to provide an upper as well as a lower limit of weight. There is no reason to think that a regulation, providing that bread shall be sold in units of fixed weight with a limited upward variation to provide for inequalities of evaporation and scaling, if applied universally, will not prove an

any State.[9]    The regulations adopted established standard-weight loaves; prohibited the sale of loaves other than of the standard weights; and limited the excess weight to not more than one ounce to the pound.[10]    This provision remained in force unchanged until the licensing system was abrogated on December 19, 1918 (after the Armistice).[11]

effective protection of the public and assist in reducing the cost of bread through fixing competition on price alone."

See " Report of the Federal Trade Commission on Bakery Business in United States," Nov. 3, 1917, made at the request of Mr. Hoover, and published by the United States Food Administration with " Report of Bakery Section of Food Administration," November, 1917. In the latter, Duncan McDuffie (pp. 20–21) recommended the following regulation as to weights:—"All bread should be baked in loaves weighing, unwrapped, 12 hours after baking, not less than 16 nor more than 17 and not less than 24 nor more than 25½ ounces and multiples thereof. Any greater variation in weights than those indicated may defeat the whole object of standardization."

[9] See " Preliminary Report on the Bread Problem, Sept. 29, 1917," Appendix. In 1916, the California state superintendent of weights and measures promulgated a regulation fixing a standard-weight loaf and permitting a tolerance in excess. It was not enforced, because of the opinion expressed by the attorney general that the regulation was beyond the scope of the official's authority. See 1915–16 Calif. Dept. Weights & Measures, pp. 63–66. In 1917, due to the influence of the bakers of the State, the legislature passed an amendment to the California weights and measures law which would clearly prevent the state superintendent from fixing a standard-weight loaf. An ordinance, fixing a standard-weight loaf with an excess tolerance, was prepared by the state superintendent and was " enacted in all large counties, cities and many towns throughout the state and has been effective in the uniform enforcement of a standard of weight for bread." 1919–20, op. cit., pp. 30–31. In 1921, a law was passed incorporating these same features. Act of June 2, 1921, c. 704.

[10] The first " Rules and Regulations Governing Licensees Manufacturing Bakery Products," effective Dec. 10, 1917, issued by the United States Food Administration, adopted the recommendation of the November Report, which limited the tolerance for excess weights to one ounce in the pound.

[11] In some other respects, the regulations were changed from time to time. See " Revised Rules and Regulations, etc.," effective Feb-

The efficacy of the prohibition of excess weights as a means of preventing short weights having been demonstrated by experience during the period of Food Administration control, a widespread demand arose for legislative action in the several States to continue the protection which had been thus afforded. Dissatisfaction with the old methods of regulation was expressed in a number of States.[12] During the years 1919 to 1923, standard-weight bread laws, containing the prohibition of excess weights, were enacted in twelve States.[13] Similar bills were introduced in others.[14] Congress enacted such a law for the

---

ruary 1, 1918, pp. 14, 15; "Special License Regulations, No. XIII, Manufacturers of Bakery Products," including May 3, 1918, Rule 2, p. 8; "Special License Regulations, No. XIII, Manufacturers of Bakery Products," Second Issue, effective September 1, 1918, Rule 2, p. 5.

[12] Washington changed from a law permitting the sale of any weight bread provided that it is properly labeled to a law fixing a standard-weight loaf with an excess tolerance. See Laws of 1913, c. 52, § 9; Laws of 1923, c. 126, § 1. West Virginia, Utah, Nevada, Detroit and Milwaukee desire to do likewise. See 1922, W. Va. Dept. Weights & Measures, pp. 14–15; 1920 Utah Dept. Weights & Measures, p. 61; 13 Conf., Weights & Measures, pp. 188, 189; Hearings on H. R. 4533, Mar. 3, 1924. In New Jersey, the department of weights and measures opposed a law similar to the Massachusetts act which embodied an alternative provision. See Report, Dept. Weights & Measures, 1921, p. 20; 1922, p. 14.

[13] See Indiana, Laws of 1919, c. 56, § 9; Montana, Laws of 1919, c. 155, § 1; Oregon, Laws of 1919, c. 82, § 1; South Dakota, Laws of 1921, c. 239, § 1; California, Laws of 1921, c. 704, §§ 1, 2; Connecticut, Laws of 1921, c. 261, §§ 2, 3, 4; Nebraska, Laws of 1921, c. 2, §§ 2, 3; Ohio, Laws of 1921, §§ 16, 17, pp. 604, 607; Texas, Gen. Laws, 1921, c. 63, p. 129; Massachusetts, Laws of 1922, c. 186, §§ 1, 2, 3; Washington, Laws of 1923, c. 126, § 1, Rem. Comp. Stat., § 11,612; Wisconsin, Laws of 1923, c. 123, §§ 1, 2.

[14] Standard weight bread legislation was recommended in the reports of the departments of weights and measures in Arizona, 1922, pp. 13, 14; District of Columbia, 1914, pp. 3, 6; 1916, p. 4; 1917, p. 6; Maine, 1913, p. 1; Massachusetts, 1916, p. 16; 1917, pp. 14, 15; 1919, p. 14; New Jersey, 1913, p. 24; 1916, p. 11; 1920, p. 18; 1921,

District of Columbia.[15]   Hawaii and Porto Rico did like-
wise.[16]   The national conference on weights and measures
indorsed a similar provision.[17]   A bill embodying the
same principles, applicable to sales of bread in interstate
commerce, prepared by the Department of Agriculture
and the Department of Commerce, was introduced in
1923 and is now pending.[18]   At the congressional hearings
thereon, it was shown that the provision against excess
weights is deemed necessary by a large majority of the
bakers, as well as by consumers and by local public
officials charged with the duty of preventing short
weights.[19]   In Nebraska the demand for the legislation
under review was general and persistent.   It was enacted

p. 22; 1922, p. 14; New York, 1911, pp. 12, 40–41; Oregon, 1917,
p. 7; Utah, 1920, p. 61; Vermont, 1920, p. 57; West Virginia, 1922,
p. 14; Wisconsin, 1916–1917, p. 137, 1919–1920, pp. 18, 34.   Bills
were introduced in the legislatures of Maine, Maryland, Mississippi,
New Jersey, New York, Pennsylvania, Vermont, West Virginia and
Wisconsin.   See 6 Conf., Weights & Measures, p. 22; 5 *ibid*, p. 88;
1919–1920 Wisconsin Weights & Measures, p. 147; 1922 New Jersey
Weights & Measures, p. 14; 1921, *ibid*, p. 19.   See Hearings on H. R.
4533, Feb. 18, 19, testimony of Congressman Brand of Ohio, pp. 9,
10; F. C. Blenck, Bureau of Chemistry, Department of Agriculture,
pp. 11–15; F. S. Holbrook, Chief of the Weights and Measures
Division, Bureau of Standards, pp. 16–19.

[15] See Act of March 3, 1921, c. 118, § 13, 41 Stat. 1217, amended
Aug. 24, 1921, c. 92, 42 Stat. 201.

[16] See Hawaii, Laws of 1919, Act 176, § 1; Porto Rico, Laws of
1917, Act No. 13, §§ 1, 2, 3.

[17] See 14 Conf., Weights & Measures, pp. 72, 73, 81; 15 *ibid*, p. 79.
See also 13 *ibid*, p. 174.   The conference changed from an alternative
measure, like the Massachusetts law, to a standard weight measure
with an excess tolerance.   See 8 Conf., Weights & Measures, pp. 278,
284, 289; 6 *ibid*, pp. 132, 133, 157.

[18] H. R. 4533, Sixty-eighth Congress, first session.   See Hearing
before the Committee on Agriculture, H. R. 4533, Feb. 18, 19, Mar.
3, 1924.

[19] See Hearings on H. R. 4533, Feb. 18, 19, pp. 11, 12, 16, 20.   The
opponents of the bill did not question the necessity of an excess
weight prohibition.   See Hearing of March 3, 1924.

504        <small>Brandeis and Holmes, JJ., dissenting.</small>

after a prolonged public discussion carried on throughout the State as well as in the legislature.[20]   Can it be said, in view of these facts, that the legislators had not reasonable cause to believe that prohibition of excess weights was necessary in order to protect buyers of bread from imposition and honest dealers from unfair competition?

*Second.*   Is the prohibition of excess weights calculated to effectuate the purpose of the act?   In other words, is it a provision which can reasonably be expected to aid in the enforcement of the prohibition of short weights? That it has proved elsewhere an important aid is shown by abundant evidence of the highest quality.   It is shown by the fact that the demand for the legislation arose after observation of its efficacy during the period of Food Administration control.[21]   It is shown by the experience

---

[20] See Nebraska State Journal, Jan. 11, 16; Feb. 9, 11, 13, 19, 23, 24; March 2, 4, 7, 8, 9, 13, 15, 16, 17, 21, 23, 30, 31; April 1, 1921. See also Bakers Weekly, Feb. 19, 1921, p. 52; Feb. 26, 1921, p. 42; Mar. 12, 1921, p. 48.

[21] " What the bakers had thought impossible before the creation of the Food Administration worked like a charm, and the trade, being relieved of the destructive competition in weight and the necessity of constantly watching the juggling of weight by their competitors, could settle down to the more important problem of furnishing the people, even under adverse conditions, with quality bread, at a price which, despite the extraordinary and oftentimes exasperating circumstances, made bread still the cheapest and best food on the American table. . . .   This standard weight insisted upon by the Food Administration is one of the regulations referred to as having been found so advantageous by the majority of bakers that in a great many cities the rule has been either voluntarily adopted as a sound business practice by the bakers or, at the instance of the trade, has been incorporated into new afterwar bakery laws and regulations." See 14 Conf., Weights & Measures, p. 27.   See also Bakers Weekly, Dec. 20, 1919, p. 49.   There is a similar movement in England to incorporate war experience (Bread Order, May 18, 1918, No. 547 (8)) into permanent legislation.   See Bakers Weekly, Jan. 15, 1921, p. 40. The Montana bakers in convention approved a law similar to the

of the several communities in which the provision has
since been in operation: Chicago; [22] California; [23] Ohio; [24]

Nebraska act. See Bakers Weekly, Feb. 1, 1919, p. 55. The present
Oregon law was sponsored by the bakers. See Bakers Weekly, Mar.
15, 1919, p. 42. The " Federal Bread Bill " has the approval of the
retail bakers of the country. See Hearings on H. R. 4533, Mar. 3,
1924. See also Statements by E. M. Rabenold, 14 Conf., Weights &
Measures, pp. 43, 74–75; Charles C. Neale, " Weight Standardization
of Bread ", 13 *ibid*, p. 115.

[22] See testimony of William F. Cluett, Chief Deputy Inspector of
Weights and Measures for Chicago, Record, pp. 56–59.

[23] See Statement of C. M. Fuller, Sealer of Weights and Measures
of Los Angeles County, California, 14 Conf., Weights & Measures,
p. 37: " The following suggestions in regard to the enforcement of
bread legislation, including tolerances, are offered as a result of five
years' successful enforcement of a standard-weight bread law. The
law itself provides that the standard weights of all loaves of bread
within twelve hours after baking shall be 16 ounces . . . or multiples
of the 16 ounce size. A tolerance of one ounce above the standard
weight is allowed for each 16 ounce unit. No stated tolerance below
the standard weight is allowed, for the reason that were there such a
tolerance, certain unscrupulous bakers would not hesitate to scale
their bread that amount short. . . . In the enforcement of this act
we have convicted 25 bakers, $535 in fines being paid, and several
thousand loaves of bread confiscated and turned over to charity. It
is interesting to note that the act has worked out so successfully in
eliminating the unfair competition of bakers who would cut the price
by selling an underweight loaf, that even those firms which were first
opposed to the idea of a standard weight bread law are now in favor
of it. And I have before me a communication from the Secretary of
the Southern California Bakers' Association stating that at a meeting
of the Wholesale and Retail Bakers' Association a unanimous resolu-
tion was passed indorsing this law." See also Bakers Weekly, Jan.
17, 1920, p. 43.

[24] See Hearings on H. R. 4533, Feb. 18, 19, 1924, pp. 3–6, 20. Also
Statement of John M. Mote, Chief Inspector of Weights and Meas-
ures of Ohio, 15 Conf., Weights & Measures, pp. 88, 89, 90, 91:
" During the period of the war control of the bakers by the United
States Food Administration it was clearly demonstrated that it was
entirely feasible for bakers to bake loaves to a uniform size, and this
is also admitted by the bakers themselves. This indicates that the

504

Indiana; [25] and the District of Columbia.[26]   The value of the prohibition is shown, also, by the fact that, after

proposal to standardize the weight of loaves of bread presents no difficulties of manufacture which may not readily be adjusted. . . .

" Eight months ago the standard-weight bread law became effective in Ohio.  We cannot say that this law is perfect in every detail—very few laws are—but we can today realize the great benefits of standardization. . . .  On May 1 a questionnaire was mailed to city and county sealers of Ohio, making inquiry as to the attitude of the public and the baking industry relative to the standard-weight provision, and every reply brought the answer of complete satisfaction to both bakers and the general public.  We cannot find that the standard of quality has been in any way lowered, due to standardization of weight.  With only the two factors of quality and price to be considered, the purchasing public is well able to determine for itself the fairness of the prices charged.  With hearty co-operation of 98% of the baking industry, and having the support of the general public, we can safely say this is one of the best statutes enacted in Ohio in recent years."  See also 126 Northwestern Miller, pp. 908, 1390.

[25] See I. L. Miller, " Results of the Indiana Model Bakery Law ", Bakers Weekly, Jan. 15, 1921, p. 47.  The writer says that the law works well and " rarely do we find an instance in which the standard weight requirement is being violated "; that only one case of short weight had to be prosecuted; that the law itself came into existence through the desire of the bakers of the State for a system " of control that would elevate the industry by eliminating certain objectionable trade practices "; that the law has placed the industry on a fair basis; that volume of business no longer depends on shrewd but objectionable trade practices, but upon quality of product; that the size of the loaf does not grow smaller in greater proportion than the price; that the law has been a protection to the consumers and has the approval of at least 98 per cent. of the bakers.  See also Bakers Weekly, Feb. 7, 1920, p. 67.  The Indiana Bakers Association unanimously adopted a resolution expressing satisfaction with the operation of the standard-weight bread law of Indiana, and offered their assistance and the benefit of their experience to other States attempting to settle the question.  See 15 Conf., Weights & Measures, p. 90.  See also Hearings on H. R. 4533, Feb. 18, 19, 1924, pp. 3–6; 12 Conf., Weights & Measures, pp. 32, 33.

[26] See testimony of George M. Roberts, Superintendent of Weights and Measures for the District of Columbia, Hearings on H. R. 4533,

extensive application and trial, it has been endorsed by
the national conference on weights and measures and is
included in the proposed "Federal Bread Law." Can it
be said, in view of these facts, that the legislature of
Nebraska had no reason to believe that this provision is
calculated to effectuate the purpose of the standard-
weight bread legislation?

*Third.* Does the prohibition of excess weight impose
unreasonable burdens upon the business of making and
selling bread? In other words, would compliance involve
bakers in heavy costs; or necessitate the employment of
persons of greater skill than are ordinarily available? Or,
would the probability of unintentional transgression be so
great as unreasonably to expose those engaged in the
business to the danger of criminal prosecution? Facts es-
tablished by widespread and varied experience of the
bakers under laws containing a similar provision, and the
extensive investigation and experiments of competent
scientists, seem to compel a negative answer to each of

Feb. 18, 19, 1924, p. 51: "I am firmly of the opinion that the law is
very well enforced in the District of Columbia . . . I had totaled
up the other day a list of weights that came into my office in one
day, for two hundred and some odd loaves, I think it was 250 loaves,
and, of course, the weights would vary a little, but I do not believe
that there were a dozen of those loaves that were out of the legal
tolerance. My recollection is that none of them were out more than
one-tenth of an ounce. The average weight was 16.03 ounces. That
indicates to my mind how the law is being observed here. The
bakers generally, while they are opposed to the law, were very much
disturbed when the law was first passed, and made strenuous efforts
to have it amended. Congress did not amend it. So far as I know
the law has proven very satisfactory. I cannot speak for the bakers,
but I do not recall that I have ever had a complaint come into my
office from a consumer about the law. They seem to be very well
satisfied and the law is very well observed. The bakers have gone
along and observed the law very well. We have found it necessary
to institute very few prosecutions, and those only for very minor
infractions of the law against a few small bakers . . ."

504        BRANDEIS and HOLMES, JJ., dissenting.

these questions. But we need not go so far. There is
certainly reason to believe that the provision does not sub-
ject the baker to an appreciable cost;[27] that it does not
require a higher degree of skill than is commonly available
to bakery concerns;[28] and that it does not expose honest

[27] Standard-weight legislation does away with the necessity for
frequent pan changes. See Bakers Weekly, Nov. 29, 1919, p. 37.
The prevailing bread prices in Ohio and Indiana are 8¢ for a 16 oz.
loaf and 12¢ for a 24 oz. loaf. In New York, the same prices are
charged for loaves running two ounces short on the average. See
Hearings on H. R. 4533, Feb. 18, 19, 1924, pp. 3, 8. Prevailing bread
prices in Wisconsin are 7–10¢ for the 16 oz. loaf and 10–15¢ for a
24 oz. loaf; California, 7½–9¢ and 10–13¢; District of Columbia, 9¢
and 13¢; Chicago, 8¢ and 12¢; Texas, 8¢; and Washington, 10¢ and
15¢. But in Iowa, the prices in the larger cities are 9¢ and 12¢ for a
16 oz. and 24 oz. loaf and, in the smaller cities, 8–10¢ for a 14 oz.
loaf and 13¢ for a 20 oz. loaf; Idaho, 10¢ and 15¢; Nevada, 10¢ and
15¢; Virginia, 9¢ and 16¢ (18 oz.). See Information received by
Director, Bureau of Standards, Dec., 1923–Jan., 1924, on file Mar.
25, 1924.

[28] While there are a large number of uncertain factors connected
with the art of breadmaking, reasonable legislation fixing standard
weights is practicable. See C. J. Kremer, "Bread Weight Legislation
and Retail Bakers," 16 Conf., Weights & Measures, p. —. At the
hearings on the "Federal Bread Bill," this was not disputed. See
Hearings on H. R. 4533, Mar. 3, 1924. It is generally conceded that
the baker can predetermine with great accuracy the weight of a loaf
of bread immediately after baking. See 14 Conf., Weights & Meas-
ures, p. 77; 15 *ibid*, pp. 80–84. Neither can it be reasonably con-
tended that a 2 oz. tolerance is not enough to cover shrinkage after
baking. For, pursuant to a resolution adopted at the Fourteenth
Conference on Weights and Measures (p. 87), a series of scientific
experiments were conducted. See 15 Conf., Weights & Measures,
pp. 80–84. The committee on specifications and tolerances recom-
mended to the conference a tolerance not in excess of the one here
allowed. See *ibid*, p. 79. An investigation on the shrinkage of white
bread, conducted in the District of Columbia by the Bureau of
Standards, showed that the shrinkage, during the first twenty-four
hours, from a one-pound loaf, round top, not wrapped, was 4.4%;
round top, wrapped, 2.7%; lunch, not wrapped, 5.7%; one-and-one-

bakers to the danger of criminal proceedings.[29]   As to these matters, also, the experience gained during the period of Food Administration control, and since then in the several States, is persuasive.   For under the Food Administration, and in most of the States, the business was successfully conducted under provisions for tolerances which were far more stringent than that enacted in Nebraska.   In the Food Administration regulation, and in most of the statutes, the tolerance was one ounce in the pound.[30]   In Nebraska it is two.   In some States the weight is taken of the individual loaf.[31]   In Nebraska it is the average of at least twenty-five loaves.   In some States in which the average weight is taken, it is computed on a less number of loaves than twenty-five.[32]   In some, where an average of twenty-five is taken the tolerance is

half pound loaf, round top, not wrapped, 4.1%; and round top unwrapped, 3.0%.   See Hearings on H. R. 4533, Feb. 18, 19, 1924, pp. 62–64.   On file at the Bureau of Standards, Mar. 15, 1924, is a record of a large number of experiments conducted in Chicago to the same effect.   See also Mass. Dept. Weights and Measures, Bul. No. 4, March, 1915, pp. 7–8.

[29] Bakers have found very little difficulty in complying with the measures where enacted.   See Hearings on H. R. 4533, Feb. 18, 19, 1924, p. 31, Mar. 3, 1924; H. E. Barnard, " Bread Legislation from the Standpoint of the Baker," 14 Conf., Weights & Measures, p. 24. The regulations promulgated by the Food Administration had the approval of the bakers.   See Report of the Bakery Division, Nov. 1, 1917, to May 31, 1918.   Also in Ohio.   See 15 Conf., Weights & Measures, pp. 88–91.   See also 5 ibid, pp. 19–22; 1917 Oregon Dept. Weights & Measures, pp. 7–9.

[30] California, Connecticut, and old Washington Corporation ordinance.   See Hearings on H. R. 4533, Feb. 18, 19, 1924, pp. 12–18, 38.

[31] Connecticut, District of Columbia, Indiana, Texas, and old Washington Corporation ordinance.

[32] Chicago (see letter of Wm. F. Cluett to Geo. K. Burgess, Director, Bureau of Standards, Dec. 28, 1923), Connecticut, Massachusetts, Model Bread Law (see 15 Conf., Weights & Measures, p. 79), Washington and Wisconsin.

smaller.[33]  Moreover, even if it were true that the varying evaporation made compliance with the law difficult, a sufficiently stable weight can, confessedly, be secured by the use of oil paper wrapping (now required in several States for sanitary reasons[34]), which can be inexpensively supplied.[35]  Furthermore, as bakers are left free to charge for their bread such price as they choose, enhanced cost of conducting the business would not deprive them of their property without due process of law.  Can it be said, in view of these facts, that the legislature of Nebraska had no reason to believe that the excess weight provision would not unduly burden the business of making and selling bread?

Much evidence referred to by me is not in the record. Nor could it have been included.  It is the history of the experience gained under similar legislation, and the result of scientific experiments made, since the entry of the judgment below.  Of such events in our history, whether occurring before or after the enactment of the statute or of the entry of the judgment, the Court should acquire knowledge, and must, in my opinion, take judicial notice, whenever required to perform the delicate judicial task here involved.  Compare *Muller* v. *Oregon,* 208 U. S. 412, 419, 420; *Dorchy* v. *Kansas, ante,* 286.  The evidence contained in the record in this case is, however, ample to sustain the validity of the statute.  There is in the record some evidence in conflict with it.  The legislature and the lower courts have, doubtless, considered that.  But

---

[33] Ohio and " Federal Bread Bill."  See also Hawaii, Montana, Oregon and Washington.

[34] Wrapping is required by statute or regulation in Louisiana, Maine, Maryland, New Hampshire, Ohio, South Dakota, Vermont and West Virginia.  See Hearings, H. R. 4533, Feb. 18, 19, 1924, pp. 11, 16.

[35] See Bakers Weekly, Oct, 16, 1920, p. 61; Hearings on H. R. 4533, Feb. 18, 19, 1924, pp. 16, 20, Mar. 3, 1924; " Report of Federal Trade Commission on Bakery Business in United States," Nov. 3, 1917, p. 13.

with this conflicting evidence we have no concern.[36]  It
is not our province to weigh evidence.  Put at its highest,
our function is to determine, in the light of all facts which
may enrich our knowledge and enlarge our understanding,
whether the measure, enacted in the exercise of an un-
questioned police power and of a character inherently
unobjectionable, transcends the bounds of reason.  That
is, whether the provision as applied is so clearly arbitrary
or capricious that legislators acting reasonably could not
have believed it to be necessary or appropriate for the
public welfare.

To decide, as a fact, that the prohibition of excess
weights " is not necessary for the protection of the pur-
chasers against imposition and fraud by short weights";
that it " is not calculated to effectuate that purpose";
and that it " subjects bakers and sellers of bread" to
heavy burdens, is, in my opinion, an exercise of the powers
of a super-legislature—not the performance of the con-
stitutional function of judicial review.

---

[36] For arguments in favor of standard-weight loaf law, see Bakers
Weekly, Nov. 29, 1919, p. 37; Dec. 20, 1919, pp. 37, 49; Apr. 24,
1920, p. 69; June 26, 1920, p. 49; July 3, 1920, pp. 39, 40; Aug. 7,
1920, p. 55; Jan. 22, 1921, p. 62.  For the arguments urged against
the legislation, see Northwestern Miller, Vol. 122, pp. 1381, 1401;
Vol. 123, p. 406; Vol. 126, p. 398; Bakers Weekly, May 8, 1920, p. 65;
May 15, 1920, p. 61.  It is interesting to note that none of the writers
contend that the tolerance provision is unreasonable.  See also Hear-
ings on H. R. 4533, Mar. 3, 1924.  There is a great contrariety of
opinion among bakers themselves as to the advisability of the legisla-
tion and the limits of a reasonable tolerance.  " Tolerances of some
kind are absolutely necessary, but in view of the conflicting opinion
of bakers, weights and measures officials, chemists and others inter-
ested in solving the problem, a ' reasonable' tolerance is about as hard
to determine as the traditional age of Ann."  See 134 Northwestern
Miller, p. 1373.  Also Bakers Weekly, Jan. 11, 1919, pp. 51, 54; Jan.
18, 1919, pp. 35, 45; Feb. 1, 1919, pp. 46, 50, 55; Mar. 15, 1919,
pp. 42, 52; Jan. 17, 1920, p. 43; Mar. 27, 1920, p. 57; May 22, 1920,
p. 40; June 12, 1920, p. 57; June 26, 1920, pp. 45, 49; Aug. 7, 1920,
p. 39; Jan. 1, 1921, pp. 39–40; Jan. 22, 1921, p. 37.