REGAL OIL CO., A CORPORATION OF NEW JERSEY, PROSE-
CUTOR, v. STATE OF NEW JERSEY, RESPONDENT.

Argued October 3, 1939—Decided December 5, 1939.

Before Justices PARKER, BODINE and PERSKIE.

For the prosecutor, *Charles Hershenstein.*

For the respondent, *David T. Wilenlz* and *Arthur A. Salvatore.*

The opinion of the court was delivered by

PERSKIE, J. The single question requiring decision in this cause is whether subdivision (c) under section 201, chapter 62, *Pamph. L.* 1939 (*R. S.* 39:12-2), deprives prosecutor of its property without due process of law in violation of the Fourteenth Amendment to our Federal Constitution, or whether it is justified as a valid exercise of the police power of the state.

The return to the writ discloses that, in pursuance of section 401, article IV, chapter 163, *Pamph. L.* 1938 (*R. S.* 39:12-4), the State Tax Commissioner filed a complaint, in a summary proceeding, in the First Criminal Court of Jersey City alleging that, on July 20th, 1939, prosecutor violated subdivision (c) of section 201, article II, chapter 62, *Pamph. L.* 1939 (*R. S.* 39:12-2), in that, as a retail dealer in the sale of motor fuels, it "did unlawfully and illegally use and display" on its premises in Jersey City, "a sign relating to the price" at which it sold its motor fuel. In answer to the complaint, prosecutor appeared through its counsel; he admitted the truth of the facts alleged in the complaint and waived all defects, if any, in said complaint. Additionally, *Exhibits P-2* and *P-3* were admitted. These exhibits are photographs of prosecutor's stations and show the allegedly objectionable signs.

The trial judge, thereupon, entered judgment of $50.00 (minimum prescribed penalty, section 301, chapter 62, *Pamph. L.* 1939; *R. S.* 39:12-3), in favor of plaintiff and against prosecutor. The prosecutor paid the penalty, under protest. Aggrieved at the penalty thus imposed upon it, and desiring to test the constitutionality of the act under which it was imposed, prosecutor made application to the chief justice for a writ of *certiorari*, which was allowed.

For a better understanding of the claims made for the respective parties, a brief resume of the legislation involved will be helpful.

Chapter 62, *Pamph. L.* 1939, was approved May 23d, 1939; it amended chapter 163, *Pamph. L.* 1938 ("An act to regulate the sale of motor fuels, and providing penalties for viola-

tions"), approved May 12th, 1938. A reading of both acts discloses, save as to subdivisions (c) and (d), section 201, article II, and some changes in sections 201 (a) and 301 in the act of 1939, that they are practically the same word for word.

As amended the act of 1939 provides substantially as follows:

201 (a). Every retail dealer shall publicly display and maintain on each pump (or other dispensing equipment) a sign, in the manner regulated by the State Tax Commissioner, stating the price per gallon at which motor fuel is sold; all taxes shall be included in the price shown on the sign, but the sign shall contain a statement of the amount of taxes included in said price, or if it is not so stated, said sign shall state that taxes are included in said price. A retail dealer shall not sell at any other price than the price, including taxes, so posted. A price when posted shall remain posted and in effect for at least twenty-four hours.

(b) No retail dealer shall sell motor fuel at a price which is below net costs plus all selling expenses.

(c) No other price sign of motor fuel so dispensed, or signs relating to the price of such fuel shall be used or displayed on or about the premises where motor fuel is sold at retail, other than the signs provided herein by section two hundred and one (a).

(d) Prohibits advertising or signs other than provided in section 201 (a); it further provides that the advertising shall be identified by the name of the product and that the letters of the name shall not be less than one-half the size of the figures used in the price.

(e) Prohibits the allowances of rebates, concessions or benefits directly or indirectly.

(f) Prohibits the use of lotteries, prizes, wheels of fortune, punch boards or other games of chance, in connection with the sale of motor fuels.

(g) Requires that all above ground equipment for the storing or dispensing of motor fuel shall bear, in a conspicuous place, the name or trade-mark of the product stored

or dispensed therefrom; additionally, it prohibits delivery into underground or above ground containers, &c., of any motor fuel other than the brand represented as being in the container, &c.; and it prohibits the substitution of one grade of motor fuel for another.

(h) Provides that if the motor fuel stored or dispensed in the containers, &c., shall have no brand name or trade-mark, that fact shall be conspicuously displayed on the container, &c., in these words "No Brand."

Section 301 provides penalties.

In pursuance of section 201 (a) the State Tax Commissioner did, on June 19th, 1939, prescribe rules concerning the display of advertising signs by retail dealers in motor fuels. (Regulation RC-1.)

These regulations provide, among other things, that (1) "each pump or other dispensing equipment maintained by any person operating a service station, filling station * * * for the sale of motor fuel for delivery into the service tank or tanks of any motor vehicle propelled by an internal combustion engine shall have a metal bracket not less than 5½″ x 8″ and not more than 8″ x 10″ attached to it, in which shall be placed a price sign [card insert] not less than 5½″ x 7½″ and not more than 7½″ x 9½″ stating the price per gallon at which motor fuel may be purchased from such pumps * * *." "The price sign shall show only the unit price per gallon. Such unit price shall include all taxes imposed whether State or Federal * * *." And (2) that the price sign (card insert) shall be displayed on both sides of the bracket.

Examination of *Exhibits P-2* and *P-3* shows that one sign is located on prosecutor's property facing the highway; it consists chiefly of the trade name of prosecutor's product, namely, "Merit," after which follows price figures of 12 9/c inclosed in a circle; the other is a small portable sign which stands at or near the curb of the sidewalk abutting the front of prosecutor's property; on this sign there also appears the trade name of "Merit" and under that trade name are the price figures of 12 9/ .

460

Prosecutor admittedly used these non-conforming signs in addition to the conforming signs used by it. The admitted objective of the additional signs was to attract the purchasing power of the approaching and passing motorists. Prosecutor asserts its right to reach that objective as one of the reasonable, necessary and vital factors incident to and part and parcel of its common law right to engage in a lawful private business, here, that of selling motor fuel. Because that right is allegedly denied to it, prosecutor asserts the broad claim that chapter 62, *Pamph. L.* 1939, permits the taking of its property without due process of law in violation of the Fourteenth Amendment to the Federal Constitution, and therefore the entire act is void. On the other hand, respondent asserts the equally broad claim that the challenged act preserves rather than destroys property rights; that it prevents price wars which theretofore had led to unfair trade practices, such, for examples, as unfair competition, adulteration and misbranding, and that, therefore, the act in its entirety is a valid exercise of the police power of the state in furtherance of public welfare, public convenience and prosperity. Our consideration and determination of this cannot be bottomed upon any such broadly asserted claims. By the record, as submitted, we are of necessity limited to the question first stated as requiring decision. To determine the answer to the question submitted we proceed to our consideration of the applicable law and to the proofs submitted.

*First:* The legal principles involved are rather well established. While it is true that a state may, in the exercise of its police power, pass legislation for the purpose of protecting and regulating public health, public safety, public morals, general welfare (*Cf. New York and N. E. Railroad Co.* v. *Town of Bristol,* 151 *U. S.* 556, 557; 38 *L. Ed.* 269, 273), including public convenience or the general prosperity (*Cf. Bacon* v. *Walker,* 204 *U. S.* 311; 51 *L. Ed.* 499; *Chicago B. and Q. Railroad Co.* v. *Illinois,* 200 *U. S.* 561, 592; 50 *L. Ed.* 595, 609; *Nashville, C. and St. Louis Railroad Co.* v. *Walters,* 294 *U. S.* 405, 429; 79 *L. Ed.* 949), it is equally true that this power is not without limitations. The means

adopted must be reasonably adapted to the accomplishment of that end, and must not be arbitrary or oppressive. *Cf. Triegle* v. *Acme Homestead Association,* 297 *U. S.* 189, 197; 80 *L. Ed.* 575, 580, 581. In other words, the legislation must bear a real and substantial relation to the public health, safety, morals or some other phase of general welfare. *Cf. Liggett & Co.* v. *Baldridge,* 278 *U. S.* 104, 111; 73 *L. Ed.* 204, 208. Thus a regulation which in effect denies or unreasonably curtails the common right to engage in a lawful business cannot be sustained under the Fourteenth Amendment. For as was said in *New State Ice Co.* v. *Liebmann,* 285 *U. S.* 262, 278; 76 *L. Ed.* 747, 754, "* * * nothing is more clearly settled than that it is beyond the power of a state, 'under the guise of protecting the public, arbitrarily to interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.' *Jay Burns Baking Co.* v. *Bryan,* 264 *U. S.* 504, 513; 68 *L. Ed.* 826; 32 *A. L. R.* 661; 44 *S. Ct.* 412, and authorities cited * * *."

*Second:* With the foregoing principles in mind, we approach the factual branch of this case in order to determine whether subdivision (c), section 201, article II of the act of 1939, *supra,* under which judgment here was entered, does or does not trench upon prosecutor's rights in violation of the due process clause of the Fourteenth Amendment to our Federal Constitution.

From the proofs taken pursuant to the writ we learn that prosecutor is what is known, in the motor fuel industry, as an independent retail dealer as distinguished from a retail dealer in motor fuel who sells the standard product of major oil companies which sell such nationally advertised motor fuels, for example, as "Esso," "Gulf," "Texaco," "Tydol," &c.

We learn that there is a direct connection from the production of the crude petroleum in the oil fields to the dispensing of refined gasoline at the retail pumps in the independent branch of the industry. In other words, the independent retail dealer occupies a recognized status in the industry, and is unquestionably a competitor of the major companies in the

industry. Prosecutor maintains sixty stations in this state; it sells only one grade of motor fuel, at one price, and under one name, viz., "Merit." Because the independent dealer, as prosecutor here, is unable to compete with the major companies in their unrestricted right and financial ability to advertise, in any form or size, the brand and qualities of their products, because the average user of such nationally advertised brands of motor fuel is not as a general rule greatly concerned with the price thereof, prosecutor's only legitimate weapon of competition is to sell its product at "a slightly lower price" than that charged by dealers of nationally advertised motor fuels. But an independent dealer must of necessity be able to bring that fact to the attention of the approaching and passing motorists.

Prosecutor's proof is that the regulation sign on the pump or other dispensing equipment is "entirely insufficient" for that purpose; that it "completely destroys" the independent gasoline dealer's opportunity "to present his gasoline and his price [therefor] to the public" and that provisions of the challenged legislation "are essentially punitive and aimed solely at independent gasoline distributors and retailers." Prosecutor's proofs further are that the use of such signs as exemplified by *Exhibits P-2* and *P-3* are "indispensable" to it in the conduct of its business; and that the "one thing" it must have "to stay in business" is the right to display adequately sized price signs to attract the approaching and passing motorists.

Respondent's justification of the act was, broadly speaking, that it prevents ruinous price wars between dealers which it is claimed unstabilized the industry and that it further prevented fraud and misrepresentation in one form or another.

It is interesting to observe in passing, for whatever value, if any, it may have, that respondent's proofs in support of its claims come from representatives of associations whose membership consists of those who in the vast majority sell the motor fuel of the major oil companies. But be that as it may, the proofs disclose that there was no price war between the spring of 1938 and 1939. But assuming that there had

been tense competition between dealers in the industry, we fail to see its relevancy. In the absence of a valid agreement to the contrary, or the violation of any valid public law, we know of nothing which makes or should make dealers in the sale of motor fuels any more immune from tense competition than other merchantmen.

Nor do we discern any merit in the claim that subdivision (c), section 201 of the act of 1939 can be supported upon the ground that it was enacted to prevent fraud and misrepresentation in the industry. A regulation sign posted on the pump or other equipment cannot be seen until one gets within a very few feet of it. The signs used by prosecutor (*Exhibits P-2* and *P-3*) can be seen for a considerably greater distance. If the regulation sign serves to prevent fraud and misrepresentation then surely prosecutor's larger signs should even more effectively tend to accomplish the same result. The court in the case of *State of Connecticut* v. *Miller* (decided in Court of Common Pleas, New Haven County, on October 27th, 1939), held that the prohibitory part of the act (use of signs other than those provided by statute) "was unreasonable, arbitrary and in its effect discriminatory." In reaching that result the court, among other things, said:

"If a retailer, as a competitive device, can and cares to undersell his rivals he is in effect forbidden to effectively advertise that fact 'upon at or within the vicinity of his premises' since he may not notify the public what his price is in letters and figures which 'he who runs may read.' He is limited to signs which only he who stops may read."

For a contrary view see *Mestichelli* v. *Valentine* (New York Supreme Court, reported in New York Law Journal of October 18th, 1939, page 1180, column 7), and *Slome* v. *Chief of Police of the City of Fitchburg* (decided by the Supreme Judicial Court of Massachusetts on October 26th, 1939), in which allegedly comparable legislation was sustained as a valid exercise of the police power of the state.

We have epitomized the provisions of the challenged act to indicate that they—as well as the provisions of the act of 1938—constitute a comprehensive code for fair and honest

dealing. Both acts make plenary provisions to reach wrong-doers. But there is no charge here that prosecutor by the use of the non-conforming signs, practiced fraud or dishonesty; or that the use of the signs misled or deceived the buying public as to either the brand or the price of the motor fuel which it sold. Indeed, there could have been no such proof. For, as we have seen, prosecutor sold but one brand of motor fuel at but one price.

We are firmly of the opinion that the limitations imposed by the regulative signs are arbitrary and oppressive. They unreasonably interfere with, curtail and deny to prosecutor, a method which is employed day in and day out by merchant-men to attract the buying power of the public. The regulation signs can accomplish but one thing and that is to deny prosecutor its guaranteed right to engage in its lawful private business. Such a result is fatal.

In fine, we conclude that subdivision (c), section 201, article II, chapter 62, *Pamph. L.* 1939, does not, under the proofs of the case at bar, have any substantial relation to public health, public morals or some other phase of general welfare; it unlawfully interferes with and imposes unreasonable and unnecessary restrictions upon prosecutor's private business; it thus deprives prosecutor of its property without due process of law in violation of the Fourteenth Amendment to our Federal Constitution; and is, therefore, unconstitutional.

Accordingly the judgment under review is set aside, but without costs.