25 N.J. Super. 568 (1953)
96 A.2d 706
THE SPERRY AND HUTCHINSON COMPANY, PLAINTIFF,
v.
WALTER T. MARGETTS, JR., STATE TREASURER OF THE STATE OF NEW JERSEY, AARON K. NEELD, DEPUTY DIRECTOR OF THE DIVISION OF TAXATION IN THE DEPARTMENT OF THE TREASURY, ARMAND J. SALMON, JR., STATE SUPERVISOR OF MOTOR FUELS TAX BUREAU IN THE DIVISION OF TAXATION IN THE DEPARTMENT OF THE TREASURY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 13, 1953.
*570 Messrs. Markley & Broadhurst (Messrs. Casey, Beinecke & Chase, of the New York Bar, of counsel and on the brief), attorneys for plaintiff.
Mr. Theodore D. Parsons. Attorney-General (Mr. Joseph A. Murphy, Assistant Deputy Attorney-General, of counsel), attorney for defendant.
*571 Messrs. Bilder, Bilder & Kaufman (Mr. Sanford Freedman, of counsel), attorneys for amicus curiae, New Jersey Gasoline Retail Dealers Association and Allied Trades, Inc., et als.
GOLDMANN, J.S.C.
This action is brought to determine the application and constitutional effect of the act regulating the retail sale of motor fuels (L. 1938, c. 163, as amended; N.J.S.A. 56:6-1 et seq.) upon the right of retailers of motor fuels, licensees of plaintiff, to issue plaintiff's "S & H. Cooperative Discount Stamps" to their customers in consideration of cash payment of the posted price.
Plaintiff demands judgment: (1) that the issuance of such stamps, in the manner stated in the complaint, be declared not illegal or prohibited by the act; (2) that the act, if construed to prohibit such practice, be declared to be to that extent unconstitutional; (3) that defendant state officials be enjoined from interfering with said stamp practice of plaintiff and its licensees; (4) that the court determine whether the actions of plaintiff's licensees, in issuing said stamps, violate the act, and (5) whether the act, as construed by defendants, is valid and constitutional.
The pertinent provisions of the act are set out in N.J.S.A. 56:6-2(a) and (e), and N.J.S.A. 56:6-3. N.J.S.A. 56:6-2(a) and (e) provide:
"(a) Every retail dealer shall publicly display and maintain on each pump or other dispensing equipment from which motor fuel is sold, in the manner regulated by the State Tax Commissioner, a sign stating the price per gallon of the motor fuel sold by said dealer from such pump or other dispensing equipment. All taxes, State and Federal, imposed with respect to the manufacture or sale of motor fuel shall be included in the price shown on said sign, but said sign shall contain a statement of the amount of taxes included in said price, or, without specifying the amount thereof, said sign shall state that taxes are included in said price. A retail dealer shall not sell at any other price than the price, including tax, so posted. Any such price when posted shall remain posted and in effect for a period of not less than twenty-four (24) hours.

* * * * * * * *
"(e) No rebates, allowances, concessions or benefits shall be given, directly or indirectly, so as to permit any person to obtain motor *572 fuels from a retail dealer below the posted price or at a net price lower than the posted price applicable at the time of the sale." (Italics ours.)
N.J.S.A. 56:6-3 provides that any retail dealer who fails to post and publicly display, in the manner required, a sign stating the price per gallon of all motor fuel sold by him, or who violates any other provision of N.J.S.A. 56:6-2, shall upon conviction be subject to the penalties therein specified, including a fine and suspension of his license (revocation upon a second or subsequent offense).
Plaintiff, a New Jersey corporation, has for more than half a century been in the business of licensing retail merchants throughout the United States to use its "cooperative cash discount system" and the "S. & H." discount stamps as tokens in connection therewith. The licensee orders stamps from the licensor at stated rates ($2.50 to $3 per thousand, depending upon the number of stamps ordered), and offers them to his customers making cash payments, one stamp for each ten cents paid "as a discount in consideration of the payment of cash when made either C.O.D. or at the option of the Licensee on or before the 15th proximo, and only for redemption by the Licensor." The company furnishes each licensee with stamp books in which his customers may paste and accumulate stamps issued to them, and it redeems the stamps, when collected, in the manner prescribed.
In the southern area of New Jersey plaintiff offers what is known as the "S. & H." merchandise method of stamp redemption, whereby the customers may select merchandise from catalogues in redemption of the stamps accumulated by them. The merchandise offered in redemption of a filled stamp book, containing 1,200 stamps issued upon cash purchases of $120, has a value of about $2.50 and represents a cash discount of 2.08%. In the northern area plaintiff offers its "C. & M." or cash and merchandise method of redemption, whereby the licensee gives customers his own merchandise worth $2 in exchange for a filled stamp book  *573 in effect a cash discount of about 1.66%. These books are later turned in by the merchant and redeemed by plaintiff at $2 each in cash.
At the time this action was instituted, plaintiff had 21,000 licensees in 39 states. There were 163 in New Jersey (69 in the southern and 94 in the northern area), a total of about 5,000 in the neighboring states of New York, Pennsylvania and Maryland, and about 2,200 in New England. The licensees include department stores, dry goods, hardware, drug, grocery and show stores, and, in some states, gasoline filling stations where motor vehicle accessories and supplies and motor fuel are sold at retail and services rendered.
Customers of licensees may accumulate "S. & H." stamps by dealing with any merchant in New Jersey who issues them, and have them redeemed as described. This introduces the so-called "cooperative" factor into the system.
Enforcement of the act (N.J.S.A. 56:6-1 et seq.) is entrusted to the defendant officials. Plaintiff claims that they, through their assistants and agents, have warned plaintiff and its New Jersey licensees that while they may issue plaintiff's stamps with sales of motor vehicle accessories and supplies, or for services, they may not issue them with sales of motor fuel  that to do so violates the provisions of N.J.S.A. 56:6-2(e) and subjects them to the penalties imposed by the act.
Plaintiff alleges that the issuance of cash discount stamps by retailers to their cash purchasers of motor fuel does not constitute or effect any rebate, allowance, concession or benefit, so as to permit any person to obtain motor fuels from a retail dealer lower than the posted price. It desires that licensees who operate filling stations may issue "S. & H." stamps freely to all cash customers, irrespective of the nature of their purchases. The company claims it is difficult to put a cash discount system into successful operation at a filling station when motor fuel sales are excluded.
Plaintiff alleges that it has built up valuable goodwill in New Jersey in connection with the use of its cash discount stamp system. Inability to use the system freely in connection *574 with sales of motor fuel has deprived it of a substantial amount of business and, it is claimed, will continue to cause irreparable loss and injury unless defendants are restrained from interfering.
By their amended answer defendants allege that the issuance of "S. & H." stamps results in giving the buyer a rebate, allowance, concession or benefit, thereby enabling him to obtain gasoline from a retail dealer below the posted price, and so violates N.J.S.A. 56:6-2; that the distribution of gasoline at retail has become an integral part of the economic life of the State, affecting the welfare and prosperity of its people and producing substantial revenue through gasoline taxes; that the business has become afflicted with fraudulent practices operating to destroy competition, defrauding the public, depriving the State of tax revenue and introducing chaos among retailers composing the industry; that the 1938 act (c. 163; N.J.S.A. 56:6-1 et seq.) was adopted to regulate various phases of the retail sale of gasoline and to eliminate the evils existing by reason of the business practices of some retailers, including the practice of giving purchasers of gasoline rebates, allowances, concessions or benefits, with resultant price wars and the adulteration, misbranding and bootlegging of gasoline; that N.J.S.A. 56:6-2(e) was designed to eliminate such practices and was a reasonable exercise of the legislative power in relation to the gasoline business, in order to promote the general welfare, health, safety and prosperity of the people.
The amended answer repeats these contentions in another form, as three separate defenses: (1) the issuance of stamps amounting to a cash discount is prohibited by N.J.S.A. 56:6-2(a); (2) such practice is further prohibited by N.J.S.A. 56:6-2(e); and (3) that prior to the 1938 law, retailers had perpetrated fraud upon the State by purchasing motor fuels without paying taxes due thereon, so that the State was deprived of revenues and incurred heavy expenses in checking upon the purchase and sale of bootleg motor fuels; that as a result, the State, to protect its citizens, facilitate the collection of taxes and prevent fraudulent practices *575 and abuses, enacted N.J.S.A. 56:6-1 et seq. in the interest of the public welfare.
After issue joined, New Jersey Gasoline Retail Dealers Association and Allied Trades, Inc. and approximately 313 individual members of its members asked leave to intervene. The motion was denied, leave being given to file a brief amicus curiae and present oral arguments at the conclusion of the hearing.
Two matters call for preliminary attention: (1) defendants' motion to dismiss the complaint, made at the beginning of the trial and renewed at the close of plaintiff's case, and (2) plaintiff's motion at the close of its case to add Berkowitz, a retail gasoline dealer, as party plaintiff.
In support of their motion to dismiss defendants urge that no justiciable controversy exists  that plaintiff is not entitled to maintain an action under the Declaratory Judgment Act (R.S. 2:26-66 et seq., now N.J.S. 2A:16-50 et seq.) since it is not a person whose rights or status are affected by the statute here in question. The argument is that since plaintiff is not in the motor fuel business, it is not within the class to which the statute, N.J.S.A. 56:6-1 et seq., is directed and therefore in no way affected by it; that our courts should not render a declaratory judgment in the absence of an actual controversy.
In New Jersey Turnpike Authority v. Parsons, 3 N.J. 235 239-240 (1949) it was said:
"* * * The remedial purpose of the [Declaratory Judgments] Act is `to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations,' R.S. 2:26-67, * * * To serve these ends it is provided that `All courts of record in this state shall * * * have power to declare rights, status and other legal relations.' R.S. 2:26-68, N.J.S.A., and particularly to determine `any question of construction or validity arising under * * * [a] statute * * *.' R.S. 2:26-69, N.J.S.A. The remedy thus provided, however, is circumscribed by the salutary qualification that the jurisdiction of the courts may not be invoked in the absence of an actual controversy. `Not only must the plaintiff prove his tangible interest in obtaining a judgment, but the action must be adversary in character, that is, there must be a controversy between the plaintiff and a defendant, *576 subject to the court's jurisdiction, having an interest in opposing his claim.' Borchard, Declaratory Judgments (2d ed. 1941), p. 29; cf. New Jersey Bankers Association v. Van Riper, 1 N.J. 193 (1948). * * *"
I am satisfied that within the limits of the issues here raised there exists a justiciable controversy that is ripe for judicial determination. This is made clear from a consideration of the testimony and the exhibits.
On October 2, 1945 the then Director of the Division of Taxation in the Department of Taxation and Finance, by the State Supervisor in charge of the Motor Fuels Tax Bureau, wrote Dornoil Products Company of Newark, N.J., advising that use of plaintiff's stamps in connection with the retail sale of gasoline would constitute a violation of N.J.S.A. 56:6-2(e). This letter was at once transmitted to plaintiff whose attorneys wrote the Director protesting the ruling. They questioned whether issuing stamps to cash purchasers of gasoline violated the statute and whether the cited section was constitutional, referred him to cases sustaining the legality of the stamp plan, and requested his careful consideration before entering and enforcing a final ruling. The reply was that the matter would have to be referred to the Attorney-General before taking a final stand; in the meantime the Bureau neither reversed nor suspended its ruling.
In the ensuing months plaintiff's attorneys made further efforts to obtain a decision, and finally suggested a conference with the Deputy Attorney-General assigned to the Bureau. A conference was promised but none ever arranged.
When the Bureau first sent out its warning in October 1945, plaintiff had four licensees in Roselle, N.J., who issued stamps to purchasers of gasoline at their filling stations. Plaintiff directed them to discontinue the practice. After a lapse of almost three years, with no further word from the Bureau, plaintiff again began to license filling station operators early in 1949. By June it had 20 such licenses in 12 different South Jersey communities. Then, on June 23, *577 1949, defendant Supervisor of the Motor Fuels Tax Bureau wrote plaintiff that the Bureau had learned of its activity, called attention to the earlier ruling and requested that in view of the provisions of N.J.S.A. 56:6-2(e), "your future activity in the selling of your stamp plan to service stations be guided accordingly." Plaintiff thereupon instructed its new licensees to desist from issuing trading stamps with retail sales of gasoline. Its attorneys finally obtained a conference with representatives of the Bureau and the Attorney-General's office, but no change in their position resulted. The Assistant Attorney-General suggested that the best way to bring the matter to a head was for plaintiff to institute an action for a declaratory judgment. This step was eventually taken.
Where a concrete, contested issue is presented, and there is a definite assertion of legal rights on the one side and a positive denial thereof on the other, there exists a "justiciable controversy," justifying maintenance of an action for declaratory judgment. State ex rel. Smrha v. General American Life Ins. Co., 132 Neb. 520, 272 N.W. 555 (Sup. Ct. 1937); cf. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The dispute here is not hypothetical or abstract; it is definite and concrete. The ruling of the Motor Fuels Tax Bureau as to the applicability of N.J.S.A. 56:6-2(e) to the use of plaintiff's trading stamps in retail sales of gasoline  a ruling adhered to by defendants  is one which plaintiff has consistently opposed as casting doubt and insecurity on its rights and legal relations, to the damage of its pecuniary interests. That plaintiff has such interests, and that they are directly affected, is clear.
The Bureau ruling aroused a justifiable apprehension of legal injury from the start. That apprehension became a reality. Plaintiff not only had to tell its filling station licensees to stop issuing stamps, but has been unable to solicit further outlets for its trading stamps among retail gasoline dealers. It has been hampered in carrying on its business with the freedom which it claims it is entitled to enjoy. *578 See, generally, Borchard, Declaratory Judgments (2d ed. 1941), pp. 40ff., 48ff., and 56ff.
Defendants rely on Ex-Cell-O Corp. v. City of Chicago, 115 F.2d 627 (C.C.A. 7, 1940), in contending that plaintiff's interest is too remote to justify its maintaining this action. That decision has been termed questionable and harsh (Borchard, op. cit. p. 50 (note 89) and p. 53). To follow it is to cut down the broad objective of the Declaratory Judgment Act, which is "to settle and afford relief from uncertainty and insecurity" (R.S. 2:26-67), and the principles enunciated by our Supreme Court in New Jersey Turnpike Authority v. Parsons, 3 N.J. 235 (1949). Borchard has observed that
"In the opportunity thus afforded to adapt judicial relief to individual and social needs, guided by considerations of wise policy and detached from the fetters of ancient writs and precedent, the utility of the courts * * * is ever enhanced." Op. cit., p. 49.
And see pp. 279ff.
At the opening of the hearing amicus curiae argued that retail gasoline dealers, being directly affected, were necessary parties, and since none had been joined as party plaintiff the proceedings were fatally defective. They cite Weissbard v. Potter Drug & Chemical Corp., 6 N.J. Super. 451 (Ch. Div. 1949), affirmed 4 N.J. 115 (1950), a case we consider wholly inapplicable to the present situation.
In view of the conclusion just reached as to plaintiff's right to maintain this action, there was no need to have any parties other than those before the court. It has been pointed out that
"Issues involving public interests or the interests of classes other than the plaintiffs or defendants, often persuade the courts to direct the joining of other parties, in order that the judgment may be more conclusive, that it may actually settle the controversy, and that other parties may be heard. This does not mean that in all cases in which a plaintiff is entitled to relief at law he must bring into the proceeding persons whose interests will be affected by the rule to be declared, for this would often place an insuperable burden upon the plaintiff. This is particularly true of actions challenging *579 the validity of a statute or ordinance which deleteriously affects the plaintiff." Borchard, op. cit. pp. 269-270.
In order to resolve any doubt, plaintiff at the close of its case moved to join Max Berkowitz, a retail gasoline dealer, as party plaintiff. Berkowitz was one of the 20 dealers licensed by plaintiff in 1949. Soon after he was warned by one of the Motor Fuel Tax Bureau field men not to issue stamps with gasoline sales. He at once ceased using plaintiff's stamp plan.
Defendants recognize that the rules of court permit the addition of parties where the ends of justice require. Rule 3:21; see R.S. 2:27-31 and Martin v. Lehigh Valley R.R. Co., 114 N.J.L. 243 (E. & A. 1934), for the similar practice before the new rules. They contend, however, that it would not be equitable to allow Berkowitz to be added as a party when plaintiff objected to permitting the retail gasoline dealers' association and 313 individual dealers to intervene in the action. The ground of plaintiff's objection  properly sustained  was that the Attorney-General was adequately protecting their rights. But the Attorney-General is opposed to what plaintiff and Berkowitz consider to be an entirely legal practice, and joins in the argument of amicus curiae about the lack of a necessary party. If there be such a lack  and we do not agree that there is  it will be supplied by permitting Berkowitz to be made a party plaintiff. In granting plaintiff's motion it should be pointed out that defendants are in no way prejudiced; their defense is purely legal, namely, that the issuance of trading stamps in connection with retail sales of motor fuels violates the act.
Courts have long recognized the sound and beneficial use, to both merchant and customer, of the cash discount stamp practice in retail merchandising. As early as Ex parte Hutchinson, 137 F. 949 (Circ. Ct. Wash. N.D. 1904), it was held that the giving of trading stamps "is merely one way of discounting bills in consideration for immediate payment in cash, which is a common practice of merchants, and is doubtless a popular method, and advantageous to all *580 concerned, and it is not obnoxious to public policy." See Ware v. Sperry & Hutchinson Co., 197 Ky. 394, 247 S.W. 14, 26 A.L.R. 686 (Ct. App. 1923); Sperry & Hutchinson Co. v. Siegel, Cooper & Co., 225 Ill. App. 540 (App. Ct. 1922), affirmed 309 Ill. 193, 140 N.E. 864 (Sup. Ct. 1923); and Food and Grocery Bureau, &c.v. Garfield, 20 Cal.2d 228, 233, 125 P.2d 3, 6 (Sup. Ct. 1942), in which it was said, "* * * the cash discount is even more vital to the all-cash store than to the cash and credit store because the proprietor of the former has staked his entire enterprise upon the ability to attract cash trade and has been willing to forego the patronage of those consumers who buy their goods upon credit."
It may be noted in passing that R.S. 45:23-1 et seq. expressly permits the issuance and redemption of trading stamps, subject to conditions with which plaintiff has complied.
Does the issuance of plaintiff's trading stamps with cash sales of gasoline in fact reduce the price or violate N.J.S.A. 56:6-2(a) or (e)? Defendants fasten upon the use of the word "discount" in the descriptive terms "S. & H. cash discount system" and "S. & H. discount stamps," and argue that the stamps are in reality a "rebate, allowance, concession or benefit," within the prohibition of the statute. We must look beyond the language to see what the actual transaction is.
The only accounting expert produced at the trial was plaintiff's witness  a highly qualified accountant in the merchandising field. He testified that "discount for cash" has a definite meaning in trade and in accounting practice. It is an allowance by the seller to the buyer in consideration of the immediate or prompt payment of the debt. It is not a price cut, nor is it commonly considered or treated as such. Rather, it is a term of payment. A true discount approximates 2%, and not much more, of the amount realized, or just about the value of the benefits which accrue to the seller from receiving cash promptly  the sooner use of his money, with an equivalent saving in interest; relief from the necessity *581 of keeping credit records, and the elimination of bad debts. If the percentage goes much above 2%, you do not have a "discount for cash." Testifying specifically as to the retail gasoline business, when a filling station operator issues stamps to a cash customer who requests them, the price at which he sells gasoline does not change, either on his books or to the customer.
In the operation of plaintiff's system, then, gasoline or merchandise sold to cash customers is at the regular, established retail price, the purchaser paying the same amount per gallon or item as is required of one buying on credit. The stamps which he may ask for and perhaps use later are his reward for paying cash. They represent 1.66% or 2.08% of the purchase, depending upon the particular plan used  percentages well within the approximated 2% range. From the retail dealer's point of view the stamps diminish by a small fraction the amount he may eventually realize from his cash business, but they do not diminish the price at which gasoline or other products are actually sold. They are not an abatement, nor a rebate, allowance or benefit reducing the price.
The question of whether the issuance of trading stamps reduces the price was considered by the Pennsylvania Supreme Court in Bristol-Myers Co. v. Lit Bros., Inc., 336 Pa. 81, 6 A.2d 843 (1939), which held that defendant did not violate the Pennsylvania Fair Trade Act by issuing trading stamps with plaintiff's products. Although the statute here under consideration is not a price-fixing statute or a fair trade act, what was said in the Bristol-Myers case and in similar cases has immediate pertinence. Justice (later Chief Justice) Maxey, speaking for the Pennsylvania court, said that the long-established practice of Lit Bros. in issuing trading stamps
"falls within the sphere of legitimate competition and does not constitute a `selling [of] any commodity at less than the price stipulated' and that it is not `unfair competition' within the meaning of the act appellant invokes. * * * What Lit Brothers did in this matter is neither a direct price-cutting of certain commodities nor *582 is it a palpable subterfuge to conceal a law evasion. It is not a `guise' assumed to cloak `reality.' The issuing of trading stamps is and long has been a legitimate means of attracting customers to the store issuing them." 336 Pa. 81, at pp. 90-91; 6 A.2d 843, at pp. 847-8.
The same question was considered in Weco Products Co. v. Mid-City Cut Rate Drug Stores, 55 Cal. App.2d 684, 131 P.2d 856 (Dist. Ct. App. 1942). It was there contended that the scheduled minimum prices of plaintiff's commodities were reduced by exactly the amount of the cash value of the stamps, namely by two mills upon each ten cents, and that the giving of trading stamps was in reality a disguised form of price-cutting. In holding to the contrary the court said:
"* * * A cash discount is a reward for prompt payment. It is a trade practice long established, and is authoritatively recognized as being not a deduction from the purchase price. Montgomery, Auditing Theory and Practice, pp. 499-500.
"Consideration of such authorities as are available leads us to the conclusion that the giving of trading stamps as in the instance now before us does not effect a reduction in the price of the article sold such as to constitute a violation of the Fair Trade Act." 55 Cal. App.2d, at p. 687; 131 P.2d 856, at p. 858.
In the Weco case, the court followed the doctrine of the Lit Bros. case in Pennsylvania, and the ruling of the California Supreme Court in the Food and Grocery Bureau case, above, which held that trading stamps did not violate the California Unfair Practices Act. Application to the California Supreme Court for a hearing in the Weco case was denied, 55 Cal. App.2d 689, 131 P.2d 856 (1943).
The distinction between a cash discount and a trade discount (which is often given for quantity purchases and has no relation to terms of payment or payment of cash) was expressly recognized by the New Jersey Fair Sales Act, N.J.S.A. 56:4-7 et seq. (L. 1938, c. 394), later declared unconstitutional by the former Supreme Court in State on Complaint of Lief v. Packard-Bamberger Co., Inc., 123 N.J.L. 180 (1939). N.J.S.A. 56:4-8 forbade resales below cost, and N.J.S.A. 56:4-7(a) provided that in determining *583 "cost" the retailer might not deduct ordinary discounts for cash. This was legislative recognition of the fact that cash discounts in merchandising are a term of payment and not a price reduction. Examination of the fair sales laws enacted by 30 states shows that 20 expressly excluded the customary discount for cash in determining "cost to retailer."
Defendants rely on Bristol-Myers Co. v. Picker, 302 N.Y. 61, 96 N.E.2d 177, 22 A.L.R.2d 1203 (1950), where the New York Court of Appeals, Chief Justice Loughran and Judge Fuld dissenting, restrained a retail druggist, under the New York Fair Trade Act, from giving cash register receipts  redeemable from defendant's merchandise at the rate of 2 1/2% of purchases aggregating $10 or more  with sales of plaintiff's products at their minimum prices. We consider the Pennsylvania and California decisions, and the dissenting opinion in the New York case, as presenting the better and sounder view. In his dissent in the Picker case, Judge Fuld points out that all sales of plaintiff's branded merchandise had been at the stipulated price, that the cash register receipt discounts did not effect a reduction in the minimum resale price of any commodity, and accordingly there had been no price-cutting whatever "in the conventional sense." He noted that the use of cash receipts and trading stamps long antedated fair trade legislation and that there was not the slightest evidence that it was the legislative design to outlaw such normal and long-established business practices of general application.
But whether one choose to adopt the view of the Pennsylvania and California courts and that of the dissenting judges in the Picker case, or the majority view in the latter decision, we must hold that the restrictions imposed by N.J.S.A. 56:6-2(e) constitute an arbitrary, discriminatory and unreasonable interference with a private business, and therefore are unconstitutional. It has been held that the sale of gasoline is not a business "affected with a public interest." Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287 (1929); Reingold v. *584 Harper, 6 N.J. 182 (1951). Defendants contend that the Legislature may nevertheless regulate trade practices within the retail gasoline industry under the police power, citing Reingold v. Harper, above, and Lane Distributors, Inc. v. Tilton, 7 N.J. 349 (1951). We shall consider these cases later.
In Sperry & Hutchinson Co. v. McBride, 307 Mass. 408, 30 N.E.2d 269, 131 A.L.R. 1254 (Sup. Jud. Ct. 1940), plaintiff sought to enjoin the enforcement of provisions of the Massachusetts Motor Fuel Sales Act substantially the same as those in the instant case. The identical trading stamp practice was involved; the charges made against that practice and the grounds urged to sustain the Massachusetts act were the same as are urged here. The Massachusetts act provided that "No premiums, rebates, allowances, concessions, prizes or other benefits shall be given directly or indirectly by any retail dealer so as to permit any purchaser to obtain motor fuel from such retail dealer at a net price lower than the posted price applicable at the time of the sale." Dealers had been notified by the defendant state official that they could not lawfully post notices relative to the giving of trading stamps, or give such stamps to customers in connection with the sale of gasoline at the pump. The court held that the material portions of the statute assailed were unconstitutional as violative of the Massachusetts Declaration of Rights.
It was conceded that the Massachusetts act was neither a price-fixing law nor a fair trade law, but designed to prevent fraud upon purchasers of retail gasoline at filling stations. The court first observed:
"Just what a trading stamp is, the nature of the transaction involved in its use, and whether traffic in it may be prohibited, are matters that have engaged the attention of many courts including our own. It has been said that the giving of trading stamps is merely one way of discounting bills in consideration for immediate payment in cash, Ex parte Hutchinson, C.C., 137 Fed. 949; that the trading stamp business is essentially legitimate and, `so far as the court can discover,' it is the only way in which the small purchaser practically obtains a discount for immediate payment, *585 whether that payment is in cash or something else. [Citing cases in eight jurisdictions.]" 307 Mass., at p. 415; 30 N.E.2d, at p. 273.
It then took up the question of whether the act could be justified as a valid exercise of the police power. The law was held to bear no relation to the public health, safety, morals or, apart from the effort to prevent fraud, the general welfare. As for preventing fraud, the court said:
"Trading stamps have been in use long enough so that any purchaser of merchandise, who is interested in acquiring and converting them to his advantage, cannot be said to be likely to be deceived as to their value. * * * The price fixed by Ouellette for the sale of his gasoline, if paid for in cash or if sold upon credit, entitled the purchaser to trading stamps. Such a transaction, so clearly free from illegality, has no reasonable connection with any possible fraud in the sale of motor fuel. On the contrary, under the guise of protecting the public from fraud, the enforcement of the statute would result in an arbitrary interference with business and an irrational and unnecessary restriction.
"* * * But whether this portion of said § 295E is a price-fixing measure or a regulatory one, we are of opinion that it is arbitrary and capricious, and therefore unconstitutional. * * *." 307 Mass., at pp. 421-2; 30 N.E.2d, at p. 276.
Although the business of dealing in gasoline was held not to be one affected with a public interest, the court notes (quoting from its earlier opinion in Opinion of the Justices, 247 Mass. 589, 595-6) that:
"`The circumstance that a business is affected with a public interest does not make legally possible every legislative regulation. All such regulations must be reasonable in their nature, directed to the prevention of real evils and adapted to the accomplishment of their avowed purpose. Under the guise of protecting the general welfare there cannot be arbitrary interference with business or irrational or unnecessary restriction.' * * *" 307 Mass., at p. 425; 30 N.E.2d, at pp. 277-8.
The Alabama Motor Fuel Act of 1940 prohibited the retail sale of motor fuels except at the exact price posted on the pump, and also prohibited the offering of "any actual prospective, contingent, immediate or future benefits, *586 concessions, discounts, refunds, premiums, or gratuities of any kind or nature whatsoever, which in any degree, manner or extent, shall be calculated or intended to effect or accomplish a sale of such product for other than said posted price or prices." In Alabama Independent Service Stations Assn., Inc. v. Hunter, 249 Ala. 403, 31 So.2d 571 (Sup. Ct. 1947), the court denied an injunction restraining defendant from selling gasoline at less than the posted price, reaffirming its previous decision in Alabama Independent Service Stations Assn. v. McDowell, 242 Ala. 424, 6 So.2d 502 (Sup. Ct. 1942), which held the quoted section unconstitutional. The McDowell case had held that the retail sale of motor fuels is not a business affected with a public interest, and that the legislation in question was outside the scope of the police power, citing in support Regal Oil Co. v. State, 123 N.J.L. 456 (Sup. Ct. 1939), the McBride case, above, and People v. Victor, 287 Mich. 506, 283 N.W. 666 (Sup. Ct. 1939). Compare, also, Sperry & Hutchinson Co. v. Boardman, 33 Pa. Dist. & Co. 571 (Pa. C.P. 1938), where the court enjoined state officials from applying and enforcing the Pennsylvania Motor Fuel Act in restraint of the issuance of plaintiff's cash discount stamps with sales of motor fuel. The declared purpose of the Pennsylvania act was "to protect the public against fraud and deception," and like our act it prohibited sales of gasoline at less than the posted price and the giving of anything of value to any purchaser of liquid fuels in an attempt to evade the provisions of the act. The court found it difficult to see how the act protected the public against fraud and deception, and held that insofar as it prohibited the giving of stamps to purchasers of liquid fuels, it transgressed the rights of the individual in violation of the Constitution of Pennsylvania. It was also held that the act attempted to make an arbitrary and unreasonable classification which deprived plaintiff of the equal protection of the laws, as guaranteed by the Fourteenth Amendment, the court saying:
"If there is any fraud or deception in the giving of stamps or discounts in the gasoline business, we fail to see why it is not so *587 in all business. To single out this one business and make it subject to restrictive regulation is arbitrary and based upon no justifiable distinction." 33 D. & C., at p. 577.
In People v. Victor, above, defendant was convicted of giving a drinking glass worth five cents with the sale of five gallons of gasoline, in violation of the Michigan law prohibiting any person engaged in the sale of bakery or petroleum products from offering, in connection with the sale thereof, any commodity in order to promote sales, with the purpose or intent to injure a competitor. The prosecution contended that the law was intended to prohibit alleged unfair trade practices, and the court proceeded on that assumption. It said:
"The mere fact that the legislature labels the giving of a premium with the sale of gasoline a `destructive trade practice' does not make it such nor render the practice subject to prohibition. * * *
"* * * No evidence was introduced to prove the contention, and there is no logical connection between the practice of giving a premium and a tendency to defraud the public. Nor is there any showing that the public is deceived into buying inferior gasoline by the offering of a premium. * * *" 287 Mich., at pp. 514-515; 283 N.W., at p. 670.
The prosecution contended finally that the giving of premiums provokes price wars which demoralize the gasoline industry, to the consequent injury of the public and with possible attendant acts of violence and lawlessness. The court commented that this could be prevented by law enforcement officials properly performing their duties, and added:
"However, a price war does tend to have undesirable results, and assuming, but not deciding, that a tendency towards a price war might be a basis of valid regulation of retail gasoline sales by the legislature, it does not follow that enforcement of § 6 of the statute will have the effect of preventing such price wars.

* * * * * * * *
There is no reasonable relationship between the prohibition of the giving of a premium and the protection of the public health, morals, safety and welfare." 287 Mich., at pp. 516 and 518; 283 N.W., at p. 671. *588 The court held that section 6 of the act violated the Michigan Constitution and was therefore unconstitutional.
In Regal Oil Co. v. State, 123 N.J.L. 456, 10 A.2d 495 (Sup. Ct. 1939), the court held unconstitutional N.J.S.A. 56:6-2(c) which prohibited the display of motor fuel price signs, other than those required on each pump, anywhere on or about the premises where motor fuel was sold at retail. The State argued there, as it does in connection with N.J.S.A. 56:6-2(e) here, that the statutory provision prevented price wars which led to unfair trade practices, such as unfair competition and the adulteration and misbranding of gasoline, and that the act in its entirety was a valid exercise of the police power, in furtherance of the public welfare, convenience and prosperity. The court said (at pages 460-461):
"* * * While it is true that a state may, in the exercise of its police power, pass legislation for the purpose of protecting and regulating public health, public safety, public morals, general welfare * * *, including public convenience or the general prosperity * * *, it is equally true that this power is not without limitations. The means adopted must be reasonably adapted to the accomplishment of that end, and must not be arbitrary or oppressive. * * * In other words, the legislation must bear a real and substantial relation to the public health, safety, morals, or some other phase of general welfare. * * * Thus a regulation which in effect denies or unreasonably curtails the common right to engage in a lawful business cannot be sustained under the Fourteenth Amendment. * * *"
The court held that the sign provision did not meet these tests, deprived the oil company of its property without due process of law, in violation of the Fourteenth Amendment, and was therefore unconstitutional. Commenting upon the State's justification of the statute as preventing ruinous price wars, the court said that even assuming there had been tense competition between dealers in the industry, it failed to see the relevancy of that fact. "In the absence of a valid agreement to the contrary, or the violation of any valid public law, we know of nothing which makes or should make dealers in the sale of motor fuels any more immune from tense competition than other merchantmen." Nor was the court *589 able to discern any merit in the claim that N.J.S.A. 56:6-2(c) could be supported upon the ground that it was enacted to end fraud and misrepresentation in the gasoline business. Cf. State v. Miller, 126 Conn. 373, 12 A.2d 192 (Sup. Ct. Err. 1940).
Defendant relies upon Reingold v. Harper, 6 N.J. 182 (1951). There the Supreme Court sustained a statute forbidding operation of retail gasoline service stations on a self-service basis. It held that the regulation was reasonably related to the public health and safety and was therefore a proper exercise of the police power. There is no such factor involved here; it can hardly be said that the giving of trading stamps for cash payments involves a potential hazard to the health, safety and welfare of the public. Cf. Sperry & Hutchinson Co. v. McBride, 307 Mass. 408, 419, 30 N.E.2d 269, 275 (Sup. Jud. Ct. 1940).
Lane Distributors, Inc. v. Tilton, 7 N.J. 349 (1951), also cited by defendants, held the Cigarette Tax Act (L. 1948, c. 65, as amended) unconstitutional in part, and the Unfair Cigarette Sales Act (L. 1948, c. 188, as amended) wholly unconstitutional because of a defect in definitions. The court observed that it is not always essential that a business be wholly affected with a public interest to be subject to regulation, and that the police power is not limited to the protection of the public health, morals and safety, but extends also to economic needs and protection from economic harm. 7 N.J. 365-366. Accepting the statement at its full value, there is nothing here to show that N.J.S.A. 56:6-2(e) bears any reasonable and substantial relation to economic needs and protection from economic harm. Although defendants vigorously argue that the provision is aimed at the elimination of price wars, there is no proof to show that such has been or will be its effect. On the contrary, the testimony of their own witness established that there have been extended gasoline price wars in recent years, and this despite the provisions of the statute. A retail gasoline dealer may, under present law, post any price he pleases at his pumps, and change it every 24 hours if he chooses. (N.J. *590 S.A. 56:6-2(a)) This being so, intense competition and the possibility of price wars must always attend the industry. Defendants have similarly failed to demonstrate that subsection (e) has in any way prevented or eliminated adulteration, misbranding or other frauds which they represent have existed in the retail gasoline industry in the past, and at whose elimination they claim the provision in question is directed.
N.J.S.A. 56:6-2(e) does not meet the limitations fixed by such cases as Regal Oil Co. v. State and Reingold v. Harper on the exercise of the police power in the area of the retail motor fuel sales business. The means adopted by that provision are not reasonably adapted to the accomplishment of the protection and regulation of the public health, safety, morals or welfare, including within the broad ambit of the general welfare, the economy of the State (Lane Distributors, Inc. v. Tilton, above). The legislation bears no real and substantial relation to any of these ends, but denies and unreasonably curtails the common right to engage in a lawful business. As was said in the Reingold case (at pp. 191-192):
"* * * the regulation of trade in gasoline, serving as it does a public need, shall not go beyond the demands of the public interest which vindicates its exercise, and shall in no sense be arbitrary or capricious, for an exercise of power that exceeds the bounds of reasonable necessity would run afoul of the fundamental common right to engage in a lawful pursuit and of the right of private property secured by the Fifth and Fourteenth Amendments of the Federal Constitution and the provision of the State Constitution cited supra. Arbitrary action under the guise of the police power is inadmissible. Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813, 32 A.L.R. 661 (1924); Regal Oil Co. v. State, 123 N.J.L. 456 (Sup. Ct. 1939). It is essential that there be a substantial relation between the regulation and the protection of the common welfare in an area of action within the reach of the police power; and also that the means be reasonable and appropriate to that end.
The police power is exercisable only to serve a basic interest of society; it is not invocable for the economic protection alone of particular individuals or groups of individuals. The relief sought must come within the range of a reasonable requirement for the common good and welfare; and a measure that, in the purported service of that end, goes beyond the public need is not effective to *591 curtail the personal and private property rights secured by the cited constitutional guaranties. If the dominant purpose be the advancement of private interests under the guise of the general welfare, there is a perversion of the power. Police regulation denotes such restraints upon property, trade or business as may be fairly imposed for the good of all. The power may not be exerted to serve private interests in contravention of common rights. New Jersey Good Humor, Inc. v. Bradley Beach, 124 N.J.L. 162 (E. & A. 1940). The statute under review is not sustainable if it is designed merely to outlaw trade practices, procedures and devices that would lower the price of gasolin to the consuming public, for that would constitute restraint of trade in derogation of the general interest."
The provision in question is unconstitutional.
Judgment for plaintiff.